(No. 6274. March 15, 1937.)

In the Matter of the Death of JOHN J. SORAN. RUTH SORAN, as the Dependent Surviving Widow, and ROBERT SORAN, STANLEY SORAN, FRANK SORAN, LEO SORAN, WILLIAM SORAN, THERESA SORAN and DANIEL SORAN, as the Dependent Surviving Minor Children of JOHN J. SORAN, Deceased, Appellants, v. G. E. McKELVEY, as Commissioner of Public Works of the State of Idaho, and Bureau of Highways of the State of Idaho, Employer, and STATE INSURANCE FUND, Surety, Respondents.

[67 Pac. (2d) 906.]

Hawley & Worthwine and E. B. Smith for Appellants.

J. R. Smead for Respondents.

GIVENS, J.—John J. Soran about 37, married, with six children, formerly a farmer and general day laborer, was working October 27, 1931, for the State Highway Department with two other men lifting and moving 30–35 foot wooden beams, weighing about 700 pounds, and an extra strain came on him and strained or wrenched his back, causing immediate severe pain in the sacroiliac region which compelled him to leave his work and he was taken to a hospital and in a few days was found to be suffering from edema (swelling) of the ankles, enlarged abdomen, irregular and "auricular fibrillation" of the heart, and he remained in the hospital until December 9, 1931. He returned to work, January 25, 1932, but could not after October 27, 1931, do more than the lightest work, none calling for any exertion. He was just able to be around and was kept on the job out of sympathy and regard for his necessities. The condition of the heart, ankles, and abdomen continued much the same

until October 18, 1932, when they were much worse: (Dr. Wahle describing the "auricular fibrillation.")

"A. It is a condition of the heart in which the auricles are going along at an extremely rapid rate, and the ventricles also, and there is no relation between the pulsation at the heart as heard by the stethoscope and the pulse at the wrist. The pulse at the wrist may be 60 to 70 and that at the apex of the heart, as listened to by stethoscope, extremely irregular and much faster than that felt at the wrist, and all of the beats of the heart don't come through, and it is a condition in which the heart is thrown out of time, the timer of the heart, the pacemaker, does no longer control the rhythmical action of the heart. It goes wild, so to speak, and the auricles of the heart go on at a very great rate of pulsation and the ventricles also, but there is no relation between the pulsation at the apex of the heart and that at the wrist. It is a condition of the heart that has gone wild, so to speak, and out of control, and in that connection at the time when I saw him the second time I found the heart very much enlarged and dilated and, that is, stretched and enlarged, very markedly, the second time I saw him."

and he was given this treatment:

"A. After doing everything possible, after tapping the abdomen and removing the fluid from the abdomen two or three times, he picked up for awhile. The liver was very much enlarged and the heart condition continued to become progressively worse, and the ultimate result was that the patient died on the 30th of December, 1932, as a result of a heart that would not come back, that would not compensate itself under every form of treatment we knew of. The kidneys became progressively worse. The abdomen persisted in filling up with fluid. We tried to improve the circulation in every way, the circulation of the heart and general circulation. We tried to improve the elimination from the kidneys in every way possible, but we could not accomplish the results we tried to, set out to do. The patient became progressively worse and died on the 30th day of December, 1932.

"Q. The second time that he came under your treatment in October, 1932, were the symptoms and ailments then suf-

fered by Mr. Soran any different than those suffered when he came under your treatment in October, 1931?

"A. With only one exception, that is to say, this time he did not have the sacroiliac sprain, but the other symptoms, the heart and shortness of breath and the swollen abdomen, that is, the other symptoms and conditions, were more pronounced. Only with the exception of the back sprain the condition was practically the same, only in a much more aggravated form. I would have to say that. The heart was worse. The ascites, that is, fluid in the abdomen, was worse. The swelling of the ankles and lower limbs was worse, and so was the shortness of breath."

In her application for a hearing before the board, claimant alleged in paragraph II that:

". . . . on or about October 27, 1931, John J. Soran was injured by accident arising out of and in the course of his employment by the above named employer, during the regular hours and course thereof; that his death resulted from said injury on December 30, 1932."

which allegation, that is, that Soran was injured by an accident, was admitted by paragraph I of respondents' answer:

"Admit the allegations of Paragraphs I, II, III, IV, and V, of said application, except that the defendants deny that the death of John J. Soran resulted from the injury alleged in paragraph II of said application."

Consequently there is no basis for respondent's criticism that claimant did not produce more evidence with regard to the accident. The accident was admitted.

The board found that "the said John J. Soran sustained a personal injury by accident arising out of and in the course of his said employment" on the 27th day of October, 1931, and that on October 30th, an examination of a physician "revealed that the said John J. Soran had a sacroiliac sprain, with pains radiating around to the groin on both sides, edema of the wrists and ankles, an enlarged abdomen and an irregular heart"; and again on November 9, 1931, he was found "to be suffering from a sacroiliac sprain, acute nephritis, enlarged abdomen with fluid in the abdomen, and a very irregular auricular fibrillation of the heart"; and on October 20th,

1932, a physician "found him to be suffering from extreme weakness, shortness of breath, a very irregular auricular fibrillation of the heart, swollen abdomen and edema of the lower legs and ankles"; that the findings of an autopsy were as follows: "Ascites with marked edema of scrotum and legs; purpuric rash of forearms and back; markedly dilated heart; diffuse nodular cirrhosis of the liver; enlarged, engorged spleen; acute hemorrhagic nephritis; engorged pancreas; that all of the above mentioned conditions disclosed by said autopsy contributed to the death of said deceased but that the heart condition was the principal cause of death." But compensation for his death sought on the basis that the injury by the strain of heavy lifting on October 27th, 1931, caused or hastened his death was denied by the board and the court in this finding:

"That at the time of said accident on the 27th day of October, 1931, the said John J. Soran had an abnormal heart; that immediately following the accident, and for several days thereafter, he continued to do his regular work and during that time he disclosed no symptoms of having received any aggravation or acceleration of his heart condition, and he had no such symptoms; that if said accident had aggravated, accelerated, exacerbated or lighted up said heart condition, the said John J. Soran would not have been able to continue doing the work that he did immediately following such accident and he would have shown some symptoms of having disturbed his heart condition, but he did not show any such symptoms; that the heart condition of said John J. Soran was not aggravated, accelerated, exacerbated or lighted up by said accident; that the conditions that were disclosed by said autopsy, as hereinbefore mentioned, were not aggravated, accelerated, exacerbated or lighted up by said accident, and that the death of said John J. Soran was not caused by nor in any way the result of said accident."

Dr. Wahle treated Soran and saw him both in October, 1931, and in 1932, and gave as the cause of death the effects of the heavy lifting which further strained the already weakened heart, finally causing it to give way.

Dr. Laubaugh treated Soran, in 1932 but not in 1931, and both from such treatment and as an expert said the

strain did not cause the condition, i. e., edema, swelling and fibrillation or enlarged heart but would enhance them:

"Q. And then the lifting caused dilation and aggravation of the condition?

"A. Assuming that he had a damaged heart, then the lifting could play its part, yes.

"Q. And it would aggravate a damaged heart?

"A. Yes.

"Q. And, of course, would be responsible for shortening the man's life, of course?

"A. For decompensation, but not the fibrillation.

"Q. But, as I understand you, that in view of the testimony you heard for Dr. Wahle, and also of the witnesses we have had here, the two lay witnesses, who have described his condition before and after, as far as objective symptoms are concerned, that you are of the opinion that at time he did have a damaged heart, before the lifting?

"A. Yes.

"Q. And it was aggravated and increased by the lifting?

"A. Yes."

While Drs. Laubaugh, Stewart and Budge (Dr. Budge testifying only as an expert, not having seen or treated Soran in his lifetime) agree that the strain of lifting would not cause the condition found in October, 1931, or materially affect an undamaged and well heart, they all agree in substance as stated by Dr. Budge:

"Q. What is your opinion, Doctor, as to whether a strain of heavy lifting will ordinarily cause an injury to the heart?

"A. Well, my opinion is that it is impossible to injure a normal heart by any form of physical strain of reasonable duration.

"Q. Now, of course, what any doctor would want to know would be the extent of the strain and the extent and nature of the lifting to determine whether or not even a damaged heart has been hurt by it, wouldn't he?

"A. Yes. I don't think that any form of ordinary daily labor, or manual labor so-called, would injure a heart unless evidences of that injured heart were manifested; in other words, I believe that the heart would have to be so impaired that you would have evidences of a decompensated heart in

order that you could injure it by ordinary manual labor. In other words, I think the other symptoms would be there such as swelling of the ankles, for example, or moderate ascites, and so on, would be there in order that you could injure it by the ordinary manual labor. If these signs and symptoms are absent, no enlargement of the liver, or absence of any signs of passive congestion, I don't think ordinary manual labor would interfere with it.

"Q. If a man for many years had been regularly and continuously doing hard work such as all kinds of general farming, pick and shovel work, heavy trucking and the like, do you think that he and those most familiar with him and his symptoms and habits would or would not have noticed evidences of a heart sufficiently damaged to be injured by lifting?

"A. Oh, I would think they would know. I think it would be generally known that he had an impairment of the heart.

"Q. You think he would suffer at times from it?

"A. Yes, I think there would be no doubt some shortness of breath and periods of swelling of the whole extremities.

. . . . . . . . . . . . . .

"Q. So far as you know from the facts here, the man had a bad heart before the injury?

"A. Apparently he did. From the autopsy findings I would state, from the anasarca as well as the increased size of the liver, that this condition is of long standing, because I understand he had a cirrhosis of the liver.

"Q. Yes. And, therefore, when the man was apparently in good condition to perform his manual labor up until he got this injury and then from then on he was in a bad condition, of what importance is the injury? You chop off the man's good condition at the time he had the injury. Right after the injury, within two days, he has ascites, or this general dropsy, and he has auricular fibrillation, and he is treated for or given the regular digitalis for failing heart. Now, what happened there?

"A. Well, my opinion is it would be impossible to produce ascites of the abdomen and swelling of the feet and ankles within a period of two days.

"Q. Well, the Doctor said—

"A. I know he said it existed at the time of the first examination of the man.

"Q. How do you account—of what importance is the injury in the case? Do you ignore the injury in the case and say that that had no effect on the man at all when you find up to the exact time of the injury he was in normal function and immediately afterward he was not in normal function? Do you ignore the injury?

"A. No. The injury, as Dr. Wahle stated, was to the back, is my impression, and that the pain radiated from the small of the back around into the groin, and the man complained of pain in his back and his groin. That was my understanding.

"Q. But you heard the Doctor state that he had the heart condition and edema?

"A. Yes, I remember what he said about the heart condition.

"Q. And he prescribed digitalis?

"A. Yes.

"Q. Doctor, you don't want to be understood as telling this Board that the injury had no effect on this man?

"A. No. I didn't say that.

"Q. Or that it had no causal connection with his heart condition?

"A. I did not say that.

"Q. You would not say that?

"A. No, I would not say that. I said my opinion was that the effect that this lift would have upon that heart would be directly proportionate to the amount of previous injury to the heart.

"Q. And then if he had enough previous injury this would aggravate it and bring about the condition which resulted eventually in his death, and in his death?

"A. It was my opinion that the lift that the man did wouldn't do the man any good. I wouldn't say that the lift would improve a damaged heart. That would be absurd.

"Q. It aggravates it and brings it back to life?

"A. Surely.

"Q. That is all.

"Redirect Examination by Mr. SMEAD:

"Q. If this lifting caused injury to a heart that was already defective, Doctor, what kind of an injury would it be?

"A. Well, my opinion is that it would be a permanent injury.

"Q. Would it be an acute dilatation?

"A. I don't think so, not necessarily no. I think it would probably be possible to produce an acute dilatation because that comes on most any time, with injury to a damaged heart, I mean. It comes on sometimes without any injury or without any work.

"Q. But, I say if the heart was already damaged, and with heavy lifting an aggravation occurred, what would you expect? What in the nature of further injury would you expect?

"A. I would expect if the heart were injured further that it would become less compensated, that the decompensation would increase, and I think it would be permanent and I think it would grow steadily worse from day to day.

"Q. State the kind of injury. From heavy lifting, if the heavy lifting would injure the heart at all, would it tend to dilate the heart?

"A. Well, I would not be qualified to say that. I don't see why it should cause a sudden dilatation of the heart, although I am no authority and my opinion would not be of much value.

"Q. I want you to tell what sort of injury. If the man had a bad heart, what sort of injury would occur?

"A. I question if the man had a damaged heart to the extent that he was able to be up and about. I question whether he could lift hard enough to cause an acute dilatation, because of the physiology of the heart and circulation. I doubt that.

"Q. If he was able to do hard work every way, do you think lifting would hurt his heart?

"A. I think, if it were a damaged heart, I think it would be harmful.

"Q. Just what effect would it have upon the heart?

"A. I think it would cause an eventual weakening, because I think if the heart were already damaged and that evidence of passive congestion were already present, I think every day the nutrition of the heart muscles would be less in proportion to the amount of accumulation of fluid in the body tissues, and I think the circulation and food supply to the muscles of the heart would be less and less from day to day and would cause the weakening of those muscles through lack of nutrition.

"Q. I thought you said in your opinion this man's condition was of long standing?

"A. It is in my opinion, based purely upon the findings of the autopsy, findings of Drs. Stewart and Laubaugh.

"Q. I thought you said in order to know whether the man's heart was further injured by the lifting you would have to know how much the lift was and under what circumstances?

"A. And then I don't think you can tell, even then.

"Q. You think it would be hard to tell?

"A. Yes."

Recross-examination by Mr. HAWLEY:

"Q. Then the lift, with the man already having a defective heart, would aggravate and accelerate the disease and cause him distress and cause him a disability and eventually shorten his life?

"A. Yes."

And Dr. Stewart:

"A. Well, he had a chronic degenerative myocarditis, which resulted in a general weakening of the heart muscles, and at the autopsy findings the heart muscle was rather flabby and pale, and there was a few erythematous spots in the aorta and large blood vessels, and there was a slight amount of thickening at the edge of the mitral valve, but no marked valvular trouble, just a little thickening of the edge as I remember it. The further autopsy findings were that of a greatly enlarged liver, which was congested, and also which was hard and nodular, containing apparently some old organized nodules, which speak for chronicity in that condition. So that the clinical diagnosis at least on the gross appearance of the liver in the autopsy would, I believe, justify a diagnosis of cirrhosis of the liver. The spleen was somewhat

enlarged and congested and hemorrhagic, as were also the kidneys. I believe those are the principal findings.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"A. The heart muscle was rather pale and flabby.

"Q. What defect is that in a heart?

"A. Well, that usually is a result of a degenerative change in the heart muscles itself, that is, a weakening of the muscle fibre, and it is more pale than normal and not so firm as a normal muscle, and that type of muscle, of course, cannot keep up its work as well as a normal muscle would.

"Q. A man could not very well perform manual labor with that type of heart, could he?

"A. They can and do.

"Q. What does it —— to them?

"A. But the continuous performance of heavy labor, of course, is likely to bring about a decompensation of the heart, that is, inability to keep up the circulation to the standard, correct standard.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Well, Doctor, we might have a new disease then with this patient, but how do you account for the sudden break in the continuity of the apparent good health? I am not asking you to testify that it is a fact that there was a sudden break because you haven't any business to testify to this fact except as you know. I am not asking you to accept responsibility for the question, but I am asking you to assume that that is a fact, from our standpoint, that here you have a man that up to the 27th day of October, 1931, so far as symptomatology is concerned, was in good health, and then you find a break immediately, and you find that approximately five or six days later that he has this edema and you find that he has this tremor of the heart, and you find that he has dizziness and you find that he is given digitalis for heart condition. You cannot ignore those conditions, can you, Doctor?

"A. No, you can't ignore them.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. And where do you go from there, Doctor, in the progress to the man's death, toward the end? Just keeps on going or gets progressively worse, doesn't it, Doctor?

"A. Yes, that is true.

"Q. And that aggravation or acceleration eventually resulted in his death—isn't that a fact, Doctor?

"A. I presume it is."

The conclusion that the accident which the board found Soran suffered on October 27, 1931, did not contribute to his death is based on the false premise that at that time he had a sound heart, when as a matter of fact the contrary was true, and so found by the board. The fact that, at that time, he had a damaged heart stands an undisputed fact, even from the three physicians, Drs. Budge, Laubaugh and Stewart, because they say the condition resulting in edema, swelling of the abdomen and heart decompensation could not have arisen at once, i. e., at the time of the strain, so perforce his heart condition, prior to the heavy lifting, was bad. With that as a fixed factual premise, all conclude the strain would have done him no good and both Drs. Wahle and Laubaugh said it probably actively augmented the bad condition of his heart resulting in his death. So the finding of the board and the trial court is unsupported by one necessary premise, i. e., previous good heart condition. The pre-existing faulty condition of the heart under the well known rule so often reiterated by this court will not defeat or prevent compensation, and the testimony of all the physicians is reasonably clear that the accidental injury on October 27, 1931, would have a deleterious effect upon a damaged heart which perforce leads to the conclusion that there was such causal connection as to entitle claimants to compensation. The discussions in *In re Larson*, 48 Ida. 136, 279 Pac. 1087, and *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, at 289, 41 Pac. (2d) 605:

" . . . . The rule would therefore seem to be that where the known facts are not equally significant, where there is ground for comparing and balancing their respective values, and, where the more probable conclusion is that for which the applicant contends, an inference in his favor is justified. Positive expert testimony will prevail over negative expert testimony. (*Womack v. New Orleans Public Service, Inc.*, 5 La. App. 71.) The expert testimony on behalf of claimant was of a positive nature, respondents' of a negative, if it be

conceded that there is negative testimony on the material issue, namely: whether the breathing of silica dust rock by the claimant set up an irritation in his lungs and lighted up his tuberculosis.''

and the opinion on rehearing at pages 295 and 298:

''If a workman drives his employer's automobile for a couple of years until he wears the tires down to the inner tubes and suddenly a tire 'blows out' and the car goes into the ditch and kills the workman, no one doubts but that an 'accident' has occurred, although the rocks had been grinding on that tire for a couple of years. Now if silica dust grinds on a workman's lungs for many months, developing latent tuberculosis until his lungs give out (blow up) and he dies, is there any material difference in 'the time, place and circumstances' of the accidents? Is not the one as much an 'accident' as the other?

''We are not unmindful of the fact that the words 'injury' and 'accident' are not synonymous terms as used in the statute under consideration. The facts of this case require a recognition of the distinction in meaning of these two terms. In the circumstances confronting us here it is not thought essential to a decision of the case that the court assert or attempt to decide just when and where the injury and result both merged into a consummated 'accident.' (*In re Larson,* 48 Ida. 136, 279 Pac. 1087, and cases cited.) All accidents are preceded by a cause,—in some cases that cause may have operated instantaneously and in others it may have been operating for days, months or years and ultimately the 'accident' occurs,—the 'blow out' (or 'blow up') happens. A workman works on a given job for years where he regularly has to lift a considerable weight; in the course of time his heart grows weaker and eventually he lifts a similar load and his heart fails and he dies; and the experts tell us that he overstrained himself in lifting the load, and we say it was an accident arising out of his employment. (*In re Larson, supra.*) Or it may impair or rupture some other part of the body so that the final effort at labor accomplishes the breakdown, and still we say it was an 'accident.' (*Hanson v. Independent School District 11–J,* 50

Ida. 81, 294 Pac. 513.) How different are such cases in principle from the one under consideration here?

. . . . . . . . . . . .

"Adverting again to the findings and conclusions of the Industrial Accident Board, we call attention to the fact that this is not a case where we have examined and weighed the evidence to determine its preponderance, but have rather reached the conclusion that there was no substantial evidence to support the findings of the board as hereinabove set out, and that as a conclusion of law, which the finding really amounted to, it was erroneous. The conclusion should have been reached that an accident occurred. What we have already said herein renders it unnecessary for us to discuss other questions presented by the petition and briefs."
are peculiarly pertinent and closely in point and fully sustain the conclusion herein.

Judgment reversed and the cause remanded for the board to award proper compensation in accordance herewith.

Costs to appellants.

Holden, J., Lee and Sutton, D. JJ., concur.

Morgan, C. J., because his son-in-law, E. B. Smith, was of counsel, deemed himself disqualified and did not participate herein.