(No. 6557.   December 21, 1938.)

HOMER BROWN, Appellant, v. ST. JOSEPH LEAD COM-
PANY, Respondent.

[87 Pac. (2d) 1000.]

Elam & Burke, for Appellant.

E. B. Smith, for Respondent.

GIVENS, J.—Appellant was employed by respondent at its lode mine at Atlanta from August, 1931, to April, 1936. About two months later he worked in Mountain City, Nevada, as a carpenter's helper and October, 1936, went to a hospital in Boise suffering from silicosis in the third stage and is now living in Mountain Home.

April 21, 1937, within one year after leaving respondent's employ, appellant, by his attorney, served notice of injury and claim for compensation on respondent's statutory agent, it having ceased its operations in Idaho, claiming he was injured by contracting silicosis while in its employ in the mine at Atlanta. Respondent denied liability contending appellant was suffering from an occupational disease and it had been prejudiced by not being notified sooner of the claimed injury or accident because it maintained complete hospital facilities at Atlanta and had had no opportunity to examine into his condition and render medical aid to appellant, and that appellant had suffered no compensable accidental injury, thus presenting two questions: Did appellant have a noncompensa-

ble occupational disease, and was respondent prejudiced by the delayed notice?

The board found as to appellant's employment and the conditions under which he worked, in line with the evidence, which showed without material dispute that the rock in the mine which had to be drilled and excavated had a high silica content, was hard, and that about 29 drills were used, of which only nine were wet drills and that these wet drills were used only intermittently when the State Mine Inspector made his visits and when he left the mine the use of the wet drills was discontinued; that the wet drills, when properly used, did away with the extremely dusty condition which otherwise prevailed; that on certain levels the water supply was inadequate and it was somewhat difficult and expensive to secure sufficient water there (for the wet drills) but the mine superintendent, Mr. Thoreson, and workmen other than appellant testified sufficient water supply and pressure could have been made available throughout the mine and that the use of the wet drills prevented the spread and dissemination of the silica dust which, because wet drills were not used and because there was inadequate ventilation, hung in dense clouds in the stopes and levels, obscuring vision and settling on the faces and clothing of the workmen. The board found the failure to use wet drills was in direct violation of sec. 46–501, I. C. A., but denied compensation because appellant had an occupational disease.

The result of the use of the dry drills instead of the wet drills, the inadequacy of the ventilation system, the resultant exposure to silicosis, and the possible contraction thereof by the miners, and the forced condition of employment (the testimony being that when the miners complained of these conditions they were callously told that if they didn't like it they could quit) were all known by respondent. In addition to this respondent knew through its managing employees that appellant, during his period of employment lost weight, appetite, became short of breath and afflicted with a cough, all well known symptoms of silicosis as shown by the testimony of the physicians herein and cited authorities:

Dr. SWINDELL:

"Q. You don't feel his (appellant's) condition is such he can follow any gainful occupation?

"A. I don't believe so.

"Q. Why do you think that?

"A. Well, he is so short of breath he wouldn't be able to do any type of labor necessitating any exertion. He might be able to sell pencils or something like that but as far as following his occupation or any requiring any physical exertion, I don't think he would be able to do it because of his shortness of breath.

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. I would like to have you tell the Board what silicosis is?

"A. Silicosis is a disease of the lungs produced by the inhalation of dust containing silica.

"Q. How does it affect the lungs?

"A. The effect on the lung is produced both by mechanical irritation and by chemical action of the silica in the lung, which produces a low grade inflammatory reaction with fibrosis, and the silica is slowly dissolved by the tissues and in solution it produces a necrotising effect on the tissues and prolongs the action to produce a slow, low grade inflammatory reaction, with the laying down of fibrous tissues over a prolonged period of time, even if exposure has been discontinued."

See also: White, Diseases of Dust Inhalation, Nelson's Living Medicine, chap. 8, p. 487; Fishbein, Modern Home Medical Adviser, p. 657.

Also, miners who were apparently more susceptible to silicosis were transferred from one part of the mine to another and from one activity to another because of the silica dust, and while respondent contends it was deprived of the opportunity to give medical treatment the evidence and result of research and statements by pertinent authorities show there is no known cure for silicosis; prevention is the only adequate means of control:

Dr. SWINDELL:

"A. There is no prescribed medical treatment which I think is of any benefit. We use various drugs. Arsphenamine is given sometimes; but there are no specific remedies.

"Q. If a man had it in the stage these two men had it, there is very little medical science can do about it?

"A. I don't think so.

"Q. Does this disease ever become worse as it progresses?

"A. Yes."

"When fibrosis has become extensive, it is not likely that much improvement can follow, even upon removal from the irritating atmosphere. There is possibly room for improvement by means of plastic operations in the nasal mucus membrane, but little likelihood of improvement in fibrotic lung conditions. Dr. Frances Aitken expresses a hope that the fibrosis in the lungs may become organized and permeated by new blood vessels, which may in part absorb the fibrous tissue; but even this will not replace alveoli which have been destroyed nor mucus surfaces which have been denuded; nor cure associated diseases such as tuberculosis; the acute respiratory types must be treated symptomatically until we have specifics for dealing with them, and probably even then they will remain more dangerous among those subjected to certain dusts than among the general population.

"The remedy for these diseases then resolves itself into protection, and places them in the catagory of 'preventable' industrial diseases—the neglect of which is receiving nowadays the severest attacks from those persons interested in the conservation of the nation's health." ("Diseases of Dust Inhalation," William Charles White in Nelson's Living Medicine, vol. III, chap. VIII.)

"Irvine has stated that it is not so much what the condition of the silicotic is today as what it will become tomorrow. Irvine emphasizes the tendency of the fibrosis to progress even though removed from exposure, and expresses his opinion that it is one of the most serious aspects of the whole silicosis problem. No remedy has been shown to be of value in elimination of the pulmonary fibrosis, although certain improvement in symptoms may be noted after the victim is removed from exposure." (National Silicosis Conference, Report of the Committee on Prevention of Silicosis Through Medical Control, U. S. Dept. of Labor, Bul. No. 21, Part 1, page 18.)

" . . . . Silicosis is probably the result of chemical action of the siliceous materials, but undoubtedly mechanical action

plays some part. Cases may be produced within less than one year of exposure but the usual case requires several years to develop. Patients complain of difficulty in breathing, of pain in the chest, and of impaired heart function. No treatment is efficacious . . . . '' (Fishbein, Modern Home Medical Adviser, p. 657.)

''There is no treatment for silicosis. All hope to stem the disease lies in preventive measures. Fans, exhaust pumps and filters of various types have decreased the concentration of dust in plants in which silicosis is a hazard. Personal respiratory protection such as masks should be offered to men working in dusty industries. Changes of occupation in plants should be provided for. At the earliest signs suggestive of silicosis, a man should leave the dust industry and seek occupation elsewhere.'' (Henry K. Taylor, M. D., and Hyman Alexander, M. D., in Journal of the American Medical Association, July 30, 1938, p. 405, vol. 3, No. 5.)

Respondent had actual demonstration within its own mine of how the wet drills could prevent the silica dust from being present in its workings. After a person has once contracted silicosis his removal from the silica-laden atmosphere may stop the further inhalation of the silica dust, but will not affect the inroads of, nor the condition due to, the presence of silica dust already in the lungs; and while rest and quiet and perhaps other treatment such as lessening fatigue and exercise may prevent the contraction of tuberculosis by one suffering from silicosis, medical or hospital treatment otherwise appears to be of no avail. (Journal of American Medical Association, and other authorities cited above.)

Respondent was not prevented by appellant's failure to give earlier notice of the silicosis from giving medical or hospital treatment to appellant; respondent knew of conditions and the possible consequence thereof as well as appellant, without notice, and in any event medical treatment and hospitalization was not what the workmen needed; what they did need was a dust free place in which to work and the only prejudice was to them because the employer did not provide such a place. Respondent, therefore, was not in any way prejudiced by appellant's failure to sooner give notice of the injury and claim of compensation. (*Beaver v. Morrison-*

*Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605; *Smith v. McHan Hardware Co.*, 56 Ida. 43, 48 Pac. (2d) 1102.)

Silicosis has been the subject of extensive recent investigation.[1]

■ This court has not placed a narrow or hypercritical construction upon sec. 43–1810, I. C. A., in determining what injuries are accidental or occupational diseases. In *Reinoehl v. Hamacher Pole & Lumber Co.*, 51 Ida. 359, 6 Pac. (2d) 860, *Roe v. Boise Grocery Co.*, 53 Ida. 82, 21 Pac. (2d) 910, and *Smith v. McHan Hardware Co.*, *supra*, a tick bite resulting in Rocky Mountain spotted fever was held to be an accidental injury. Clearly if the court had understood that the disease must follow and be independent of the injury there could have been no recovery because the tick bite in and of itself, while accidental, was not injurious, it was the infection of the disease carried into the body of the victim which constituted the injury. So herein while the language of our statute differs from other compensation statutes, both parties herein have presented and squarely met the issue herein on the basis

[1]*Kovaliski v. Collins Co.*, 102 Conn. 6, 128 Atl. 288; *Williams v. Guest, Keen & Nettlefolds*, (1926) 1 K. B. 497; annotations, 62 A. L. R. 1460; 97 A. L. R. 1412; *Sisko v. Weiskettel & Sons Co.*, 163 Md. 614, 163 Atl. 851; *Simmons v. Etowah Monument Co.*, 42 Ga. App. 633, 157 S. E. 260; *North End Foundry Co. v. Industrial Com.*, 217 Wis. 363, 258 N. W. 439; *Breen v. Morgan Crucible Co. Ltd.*, (1933) 26 B. W. C. C. 368; *Sullivan's Case*, 265 Mass. 497, 164 N. E. 457, 62 A. L. R. 1458; *Metropolitan Life Ins. Co. v. Krupel*, 165 Va. 602, 183 S. E. 241; *Chain Belt Co. v. Industrial Com.*, 220 Wis. 116, 264 N. W. 502; *Nelson's Living Medicine*, chap. VIII; Report of the National Silicosis Conference, U. S. Dept. of Labor Bul. No. 21, Part 1; *Silicosis and Other Dust Diseases*, by Albert E. Russell, M. C. Surgeon, U. S. Public Health Service; Nelson's Perpetual Loose-Leaf Encyclopedia, vol. 11, p. 217; *Industrial Welfare and Medicine*, Encyclopaedia Britannica, 14th Ed., vol. 12, p. 309; *The Silicosis Menace*, Literary Digest, vol. 118, Dec. 15, 1934, p. 15; *Village of Living Dead*, Literary Digest, vol. 121, Jan. 25, 1936, p. 6; *Slow Death in Illinois*, Milton S. Mayer, Nation, vol. 144, April 17, 1937, p. 432; *Some of the Results of Recent Research on the Control or Prevention of Silicosis*, Information Circular, I. C. 6994, Bureau of Mines, Feb. 1938; *Review of Literature on Conditioning of Air for Advancement of Health in Mines*, Information Circular, I. C. 7001, Bureau of Mines, March, 1938.

that our statute bars from compensation occupational diseases, and we will so consider the point.

The authorities all agree that silicosis is in large part preventable by one device or another; that is, by not permitting the silica dust to enter the lungs of the worker at all, or at least in such small quantities as not to be injurious. (Methods for Protection Against Silicosis, etc., Information Circular, I. C. 6989, U. S. Bureau of Mines, Feb. 1938; Encyclopaedia Britannica, vol. 15, p. 533, and other authorities, *supra*.) The evidence conclusively shows that respondent, by its own experience, in its own mine, knew that by the use of wet drills the hazard could have been done away with, or at least greatly lessened, and that not to do so was a crime.

Thus, under the circumstances of this case appellant did not suffer an occupational disease under sec. 43–1810, I. C. A., because an occupational disease is one which inheres in the particular employment and *cannot by reasonable means be prevented.*

"The term 'occupational disease' has been variously defined and interpreted in Judicial decisions and textbooks. Schneider in Workmen's Compensation Law, vol. 1 (2d Ed.), p. 644, said: 'A disease contracted in the usual and ordinary course of events, which from the common experience of humanity is known to be incidental to a particular employment, is an occupational disease, and not within the contemplation of the Workmen's Compensation Law.' Elaboration of the definition is found in *Gay v. Hocking Coal Co.*, 184 Iowa, 949, 169 N. W. 360, 363. The Court said: 'An "occupational disease" suffered by a servant or employee, if it means anything as distinguished from an actionable wrong or injury, is neither more nor less than a disease which is the usual incident or result of the particular employment in which the workman is engaged, as distinguished from one which is caused or brought about by the employer's failure in his duty to furnish him a safe place to work. If the employer fails to provide a reasonably safe place to work, or fails to observe the specific requirements of the statute with respect thereto, and as a result of such neglect the employee is injured, the liability of such employer cannot be avoided by calling such injury an "occupational disease," or by showing that disease of that nature

is often the accompaniment or result of such employment, even when all due care has been exercised by the employer.'

"These definitions have been widely quoted and have been generally accepted by the courts and text-writers as correct. Assuming their correctness and applying them to the facts in the case at bar, it is obvious that the plaintiff was not injured by means of an 'occupational disease.' The plaintiff testified that he had worked at an asbestos plant in Charlotte for about eleven years prior to his employment with the defendant without suffering any ill effects from the work. He alleged in his complaint and offered evidence tending to show that his injury was produced and proximately caused by the negligence of defendant, in that it maintained no dusting or suction system such as was approved and in general use in other asbestos plants. Consequently, his allegation and proof both established the fact that his injury was caused by the negligence of the employer, and hence was not 'the usual incident or result of the particular employment in which the workman is engaged.' That is to say, the injury was not produced by the inherent nature of the work itself and classifiable as an occupational disease, but was produced by the active negligence of the employer and his failure to exercise reasonable care." (*McNeely v. Carolina Asbestos Co.*, 206 N. C. 568, 174 S. E. 509, 511; see, also, *Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 128 Atl. 635, 44 A. L. R. 363; *In re Pero*, 49 Wyo. 131, 52 Pac. (2d) 690.)

While it is true there are decisions taking another view (*Billo v. Allegheny Steel Co.*, 328 Pa. 97, 195 Atl. 110; *Plazak v. Allegheny Steel Co.*, 324 Pa. 422, 188 Atl. 130), an analysis of our own cases and the construction placed upon them by other courts clearly supports our position. (*In re Pero, supra.*)

As to there being an accidental injury within the meaning of the statute this court has repeatedly held, and the facts and circumstances of this particular case and the reasoning applicable thereto clearly shows the reasonableness and correctness of the holding, that the accident need not occur at one instant, but that there may be repetitious causes all relatively slight which culminate and result in as serious

and fatal an injury as though the disabling or lethal blow or incident occurred at one time.

The American Illustrated Medical Dictionary defines silicosis thus: "Pneumonoconiosis due to the inhalation of the dust of stone, sand, or flint," pneumonoconiosis being defined therein as a lung disease attended by fibroid induration and pigmentation. Fibroid is there defined as a fibroma or a fibrous structure, and fibroma as "a tumor composed mainly of fibrous or fully developed connective tissue." A phagocyte is defined as "any cell that destroys micro-organisms or harmful cells by enveloping and absorbing them."

Thus the apparent action in and on the lungs is both chemical and mechanical, and the phagocyte, instead of being able to envelope and destroy the minute particles of silica dust without injury to the person, creates and builds up around the dust particles such hard tissue as to eventually so permeate the lungs as to seriously and eventually sometimes fatally impair the power to breathe, if in the interim as is often the case, tuberculosis does not set in, as in *Beaver v. Morrison-Knudsen Co., supra.* (Journal of the American Medical Society, *supra.*)

While compensation under our statute does not depend upon the negligence of the employer, negligence of the employer not only does not preclude compensation but compels it (71 C. J. 580). If the respondent does not admit that the infliction of silicosis upon its workmen was accidental and not expected it is forced into the position of intending they should become so inflicted and that it had utter disregard of the humanities, and was callously indifferent to their health, safety and life.

In *Aldrich v. Dole*, 43 Ida. 30, 35, 249 Pac. 87, the worker received small but repeated blows upon his knee from a loose shift lever in a truck, ultimately resulting in serious injury. The same contention was made there as here that there was no definite accident:

"Had there been a single occasion when the knee pressed the lever and was struck by it, and injury had resulted therefrom, there would be no difficulty in concluding that the injury was received by accident. In such case it would be said that in the discharge of his duties the workman placed

his knee against the lever, the lever struck the knee, the injury resulted; and it would not be said that the injury was usual, was expected or was designed. Now if the single pressing of the knee by the lever would result in an injury by accident, can we say that the injury actually received was not caused by accident merely because there was a continuation of the causes that brought on the injury? The statute does not restrict compensation to an injury that results from single event, and there would seem to be no sound reason for holding that an injury occasioned by a number or series of events is not within the act. The continuous pressing of the lever and the repeated striking of the knee had a cumulative effect so that the injury came on gradually; and claimant received the unexpected and unintentional injury during the time of the operation of the causes that produced the injury.''

Again in *Beaver v. Morrison-Knudsen Co., supra,* the court stated:

''If a workman drives his employer's automobile for a couple of years until he wears the tires down to the inner tubes and suddenly a tire 'blows out' and the car goes into the ditch and kills the workman, no one doubts but that an 'accident' has occurred, although the rocks had been grinding on that tire for a couple of years. Now if silica dust grinds on a workman's lungs for many months, developing latent tuberculosis until his lungs give out (blow up) and he dies, is there any material difference in 'the time, place and circumstances' of the accidents? Is not the one as much an 'accident' as the other?

''We are not unmindful of the fact that the words 'injury' and 'accident' are not synonymous terms as used in the statute under consideration. The facts of this case require a recognition of the distinction in meaning of these two terms. In the circumstances confronting us here it is not thought essential to a decision of the case that the court assert or attempt to decide just when and where the injury and result both merged into a consummated 'accident.' (*In re Larson,* 48 Ida. 136, 279 Pac. 1087, and cases cited.) All accidents are preceded by a cause,—in some cases that cause may have operated instantaneously and in others it may have been

operating for days, months or years and ultimately the 'accident' occurs,—the 'blow out' (or 'blow up') happens."

"It is admitted, however, that he *suffered from lead poisoning*. There is no substantial evidence to show that he suffered this lead poisoning from any previous engagement or employment or that his condition was chronic or resulted from prolonged contact with lead oxides. On the other hand, it does appear that he used lithrage containing lead oxide in course of his employment with appellant company; that the most reasonable hypothesis to be drawn, from the facts and circumstances of his employment and his subsequent illness, is that the poisoning came from working with and using the litharge in the course of his latest employment with the company. The evidence indicates strong probabilities that claimant was poisoned by the litharge which he used in installing and working on the ice machines and plants for the company and that his poisoned condition is the result of an accident which occurred in course of the employment. The law does not exact certainties; it acts upon probabilities." (*Wozniak v. Stoner Meat Co.,* 57 Ida. 439, 65 Pac. (2d) 768.)

See, also: *In re Sullivan,* 265 Mass. 497, 164 N. E. 457, 62 A. L. R. 1458; *Roe v. Boise Grocery Co., supra.*

The reasoning in *Sullivan Min. Co. v. Aschenbach,* 33 Fed. (2d) 1, is likewise in harmony with this result, because though the court stated that if the disability therein had been gradually progressive it would have been an occupational disease, the question of its being preventable and the failure to prevent being a violation of the criminal statute was not presented nor considered as herein.

In *Aldrich v. Dole, supra,* the injurious condition arose on the outside of the body by repeated blows of the gear-shift handle, in the case at bar the injury arose internally by the repeated drawing into the lungs of the small silica dust particles and the consequent fibrous growth which in the instant case cut down the ability to breathe, and the one (i. e. internal) is as much an accident as the other (i. e. external). Thus, under the circumstances of this case appellant was not suffering from an occupational disease and the evidence and findings do not support the board's conclusion to the contrary (*Beaver v. Morrison-Knudsen Co., supra*), and the order of

the board denying compensation is therefore reversed and the cause remanded with instructions to award compensation to appellant as a married man with four dependent children.

Costs to appellant.

Holden, C. J., and Ailshie and Budge, JJ., concur.

Morgan, J., deeming himself to be disqualified, did not sit with the court at the hearing nor participate in the opinion.

ON REHEARING.

(March 9, 1939.)

GIVENS, J.—Respondent reemphasizes the contention that it cannot be ascertained with definite certainty just when the accident occurred, but (without conceding it could be considered an accident) that the ravages of silicosis had progressed to such an extent prior to appellant's cessation of employment with respondent, and more than one year prior to the date the claim was filed, as to bar the claim under sec. 43–1202, I. C. A.

The injury may be, as herein, coincident with the accident or subsequent. The reasoning in and application of *Aldrich v. Dole,* 43 Ida. 30, 35, 249 Pac. 87, and *Beaver v. Morrison-Knudsen Co.,* 55 Ida. 275, 41 Pac. (2d) 605, support the original opinion to the effect that the accidental accumulated effects from the inhalation of silica dust could reasonably be considered to have reached such a peak at the time appellant ceased his employment as to constitute at that time a completed accident.

These additional authorities further support us on this point: *McNeil v. Panhandle Lumber Co.,* 34 Ida. 773, 786, 203 Pac. 1068; *Johnson Oil Refining Co. v. Guthrie,* 167 Okl. 83, 27 Pac. (2d) 814, 90 A. L. R. 616; *Industrial Com. of Colorado v. Ule,* 97 Colo. 253, 48 Pac. (2d) 803.

The accidental silicosis herein, perforce happened while appellant was employed by respondent and not before or after because the record shows it was at that time alone he was

exposed to the silica dust, and it is unquestioned he had sili-cosis.

The original opinion is therefore adhered to.

Ailshie, C. J., and Budge and Holden, JJ., concur.

Morgan, J., deeming himself disqualified, did not partici-pate.