(Nos. 6845, 6846, 6847, 6848, 6849, 6850.  July 17, 1941)

FLOYD HOWARD, Appellant, v. TEXAS OWYHEE MINING & DEVELOPMENT COMPANY and STATE INSURANCE FUND, Respondents.

GUY CONNELL, Appellant, v. TEXAS OWYHEE MINING & DEVELOPMENT COMPANY and STATE INSURANCE FUND, Respondents.

DELL JOHNSON, Appellant, v. TEXAS OWYHEE MINING & DEVELOPMENT COMPANY and STATE INSURANCE FUND, Respondents.

HARLEY M. STEVENS, Appellant, v. TEXAS OWYHEE MINING & DEVELOPMENT COMPANY and STATE INSURANCE FUND, Respondents.

ANDREW VOIGHT, Appellant, v. TEXAS OWYHEE MINING & DEVELOPMENT COMPANY and STATE INSURANCE FUND, Respondents.

RAYMOND SMITH WILLIAMSON, Appellant, v. TEXAS OWYHEE MINING & DEVELOPMENT COMPANY and. STATE INSURANCE FUND, Respondents.

(115 Pac. (2d) 749)

Elam & Burke and E. B. Smith, for Appellants.

Clarence L. Hillman, for Respondents.

HOLDEN, J.—The transcript on appeal was filed August 26, 1940. Thereafter counsel for the respective parties made eight separate stipulations for extensions of time (four to each party) within which to prepare, file and serve briefs, the last stipulation for an extension of time having been made May 10, 1941, which expired May 17, 1941. However and notwithstanding the long period covered by the stipulations for extensions of time, the last brief was not filed with the clerk of this court until the day of the hearing, July 1, 1941. But for these stipulations these cases would have been heard and disposed of several months ago.

The record discloses Floyd Howard was employed by the Texas Owyhee Mining and Development Company, hereinafter referred to as the company, from February, 1937, to April 22, 1939; Guy Connell was employed by the company from January 14, 1938, to May 6, 1939; Dell Johnson from May 5, 1938, to January 10, 1939; Harley M. Stevens from September 27, 1937, to February 25, 1939; Andrew Voight from May, 1938, to May 26, 1939, and Raymond Smith Williamson from September, 1937, to April 22, 1939. All six worked in the company's Mayflower Mine and subsequently sought workmen's compensation

for silicosis suffered by reason of their employment. The six cases were consolidated for trial and tried before the Board commencing February 14, 1940. Thereafter findings of fact were made and orders entered denying compensation to each of the six claimants, from which each claimant appeals.

It was stipulated by counsel for the respective parties: "That but one transcript on said appeals be prepared, which shall contain all evidence taken and proceedings had at said consolidated trial, and be filed in the case of *Floyd Howard, Employee, appellant, vs. Texas Owyhee Mining & Development Company, employer,* and *State Insurance Fund, Surety,* respondents, and shall be deemed to have been filed in each of the other cases."

Pursuant to such stipulation, and inasmuch as the facts bearing on the right of the claimants, respectively, to recover compensation are identical and that briefs in the Howard case only have been filed, and that whatever decision is reached in that case will be determinative of each of the cases consolidated therewith, we proceed to a consideration and determination of the Howard appeal.

The record presents one question which we deem to be decisive: Is the disease suffered by Howard, to-wit, silicosis, an occupational disease under Section 43-1810, I. C. A., that is to say, one which inheres in the particular employment, which can not be prevented by reasonable means?

The pertinent facts found by the board are:

"... that prior to the year 1937 an air raise or man-way was constructed at a point about 280 feet southerly from the shaft and connecting the 100 and 200 foot levels; when constructed this air-raise was timbered and laddered so as to permit the free passage of air and men through it, but some of the timbers in such air raise had decayed prior to 1937 and during that and subsequent years the air raise was caved in and partially blocked in such a way as to prevent the passage of men through it but it still permits the circulation of air; ... that said vein consists of quartz, quartzite and gouge material and varies in width from only a few inches in some places to 15 feet in other places; that the country rock in which

said vein is found is a fractured granite with some intrusions of porphyry; that said country rock and vein material contains some moisture; that it has been necessary at frequent intervals to pump water from the various levels and also from the shaft; that prior to the month of May, 1938, mining operations and development in said mine were carried on by means of hand drills and a great deal of silica laden dust was produced in the various drifts, stopes and raises of the mine; that in the month of May, 1938, a modern air compressor having a capacity of 500 cubic feet of air per minute was installed as well as air-powered jack-hammers, stopers and buzzees all equipped for wet drilling; that for the purpose of carrying water and compressed air from the surface, galvanized iron pipes were laid to within a short distance of the places where the drilling was carried on in the various stopes and raises of the mine; that rubber hose in 50 foot lengths were supplied for use in connecting the drilling equipment with said pipes; that when such equipment is in use, water is forced through the drill and sprayed onto the surface of the rock that is being drilled; that by such use of water in drilling operations much less silica laden dust is produced than is the case where dry drilling is done, but some silica laden dust is produced regardless of what kind of drilling is done; that such wet drilling equipment was put into general use in the defendant's Mayflower Mine early in the month of June, 1938, and instructions were then given by the employer's managing officers to the effect that water be used in all drilling operations thereafter carried on in the mine; that such instructions regarding the use of water in drilling operations were generally complied with by all employees working underground in the Texas-Owyhee Mining and Development Company's Mayflower Mine, but occasionally an employee would drill without the use of water; that such occasional violations of instructions were known by the shift boss under whose immediate charge the drilling was done."

"That during the year 1937 the Mayflower Mine was ventilated by means of a fan located at the station by the shaft on the 300 foot level; that several raises

connecting the various levels in the mine afforded some circulation of air brought about by changes in the atmospheric pressure; that sometime during the late winter or spring of 1938, the use of said fan at the 300 foot level station was discontinued and it was not thereafter used; that the clothing the men wore while working underground became covered with dust; that blasting operations were generally carried on just before the close of each work shift; that blasting operations created much dust and smoke and fumes; that it was the practice of the employees carrying on such blasting work to remain within a reasonable distance in order to determine whether or not any of the powder had failed to explode; that after the new air compressor was installed at the mine in the spring of 1938, the drills were occasionally disconnected from the air hose and compressed air was used to clear the silica laden dust and smoke and fumes from the various stopes and other places in the mine whenever such conditions became too severe, but there was always more or less silica laden dust in the air in the vicinity where drilling operations or blasting was carried on; . . . that in 1937, the underground employees always went to the surface at lunch time to eat their meal but from and after the spring of 1938, this practice was changed and the underground employees ate their lunch at the various station levels by the shaft; that the lunch period was about 30 minutes in length and there was always considerable silica laden dust in the stopes and raises when the men returned to work after eating their lunch."

" . . . that while employed in the defendant's Mayflower Mine from February, 1937, until April 22, 1939, claimant worked as a miner underground in the various stopes and raises between the 400 and 200 foot levels; that while thus working in the Mayflower Mine, claimant developed a sore throat and a cough and began to lose strength and weight in the summer of 1938; that in the month of November, 1938, claimant was off duty for a while and had his tonsils removed and then returned to work and continued thereat, although the condition of his throat and chest grew steadily worse, until April 22, 1939, at which time he ceased said employment and ever

since then has been, and now is, totally disabled for work; ... "

"That claimant now has the disease of silicosis which is a disease caused by inhaling silica laden dust into his lungs; ... that said disease of silicosis was caused by, and is the result of, the silica laden dust which claimant inhaled into his lungs while in the performance of his duties as a miner ... ; that said disease is an occupational disease and is not the result of any personal injury by accident arising out of and in the course of claimant's said employment; that said claimant did not sustain a personal injury by accident arising out of and in the course of his said employment."

"That the defendant, Texas-Owyhee Mining & Development Company, employer, had personal knowledge of the silica laden dust conditions under which claimant was working in the Mayflower Mine during all of the time that claimant was there employed ... ; that said defendant has personal knowledge of the reasons that caused claimant to cease his said employment. ... "

"From the foregoing findings of fact are made the following rulings of law: That the claimant, Floyd Howard, is not entitled to an award against the defendants, ... or either of them, for payment of any compensation herein and that his claim for compensation should be denied and his application dismissed; that an order should be made, given, filed and entered herein accordingly."

The identical question presented in this case was presented in *Brown v. St. Joseph Lead Company*, 60 Idaho 49, 87 P. 2d 1000. The question was presented there, as it is here, as to whether silicosis is an occupational disease inherent in the employment which cannot be prevented by reasonable means. Dr. Swindell, an expert on the treatment of and protection from silicosis, testified in that case. He pointed out, in agreement with the best medical authority, that:

"The remedy for these diseases [silicosis and associated diseases] then resolves itself into protection, and places them in the category of 'preventable' industrial diseases— the neglect of which is receiving nowadays the severest attacks from those persons interested in the

conservation of the nation's health." ("Diseases of Dust Inhalation," William Charles White in Nelson's Living Medicine, vol. III, chap. VIII).

Continuing: "There is no treatment for silicosis. All hope to stem the disease lies in preventive measures. Fans, exhaust pumps and filters of various types have decreased the concentration of dust in plants in which silicosis is a hazard. Personal respiratory protection such as masks should be offered to men working in dusty industries. . . . " (Henry K. Taylor, M.D., and Hyman Alexander, M.D., in Journal of American Medical Association, July 30, 1938, p. 405, vol. 3, No. 5.)

Raymond D. Briggs, mining engineer, and at the time of the trial chief engineer of the Minnie Moore Mining Company, described the best methods and mining practices for controlling deleterious dust. He testified:

"Q. ... State if there are any other methods in your opinion that could have been taken there according to good mining practice to have kept down any dust which would have prevailed?

A. The direction of air currents is a factor, to take it out of the workings so no one else is hazarded by being subjected to the presence of those air currents.

Q. How are those air currents controlled?

A. They may be controlled by baffles or gates, exhaust or blowing fans, together with manipulations of blankets or doors on whatever, if any currents there may be present in the mine at any particular moment.

Q. How would an exhaust fan have any effect on this situation?

A. Exhaust fans are preferable in many instances because of the fact if properly installed and operated and the intake is near or at the point at which dust is being created, it is taken out of that area and does not subject men to that air strain that might be retained. The air is speeded up and conducted out through an air passage or conduit and carried—carries out the suspended material.

Q. Where would this air be taken to?

A. The air vent or outlet is usually taken to the surface if possible. If they—if not, they are discharged into the abandoned stopes or abandoned drifts, drift ends, but

before being discharged the common practice is to put that through a big hose in the larger mines or put in traps that will let the heavier particles drop out of the air currents. These traps will empty at regular intervals which would be prescribed by the rapidity with which they fill. Considerable care is taken to see these traps are emptied of the particles and that they are not again admitted into the underground air."

The testimony of Mr. Briggs is in harmony with authoritative mining opinions as to the best mining practices. In "The Working Environment," etc., Utah State Board of Health, November 1940, p. 142, the following appears:

"Natural ventilation is never dependable, and always should be supplemented by mechanical methods of ventilation, if all working faces are to be continually active. . . .

"Mechanical ventilation practice varies, but usually the foul air is drawn from the mine at one or more points by large fans capping ventilation shafts, and pure air flows into the mine through intake shafts located elsewhere. After reaching the mine, the air is bled off at various shaft stations and distributed to many points through the various drifts, crosscuts, and raises. It then flows upward or downward through the stopes, and then out through other drifts to the exhaust shaft. Air flow is controlled by the use of ventilation doors, air-bridges, brattice walls and booster fans. In some mines, air is blown into the air-entries, and in other mines, a combination positive and negative pressure fan system is used."

From a Report on Medical Control to the U. S. Department of Labor National Silicosis Conference, Bulletin No. 21, part 2, entitled "Prevention of Silicosis Through Engineering Control," we quote the following:

"In addition to the preventive measures necessary at the various operations underground, a complete system of mechanical ventilation should be installed by means of which clean, fresh air should be supplied to the workings. A general system may be augmented by secondary or auxiliary fans to ventilate dead ends or inaccessible places and to act as boosters to the main system, but the greatest care should be taken to prevent air recirculation.

Dust-laden air of underground workings should be routed to the outside by the shortest possible route."

While the Board found in the instant case that the company put wet drilling equipment into general use in the Mayflower Mine in June, 1938, and that less silica laden dust was produced by such wet drilling "than where dry drilling is done," that does not, as apparently decided by the Board, prevent the recovery of compensation nor does it prove that silicosis is an occupational disease which inheres in this particular employment, nor that silicosis cannot be prevented by the adoption and use of the various means recommended by the best medical authority and required by the best mining practices.

The evidence is undisputed, and the Board found: that blasting operations were generally carried on just before the close of each work shift; that blasting operations created much dust and smoke and fumes; that there was always more or less silica laden dust in the air in the vicinity where drilling operations and blasting were carried on; that after the spring of 1938 the underground employees of the company ate their lunch at the various station levels by the shaft; that the lunch period was about 30 minutes in length "and there was always considerable silica laden dust in the stopes and raises when the men returned to work after eating their lunch"; that during the year 1937 the Mayflower Mine was ventilated by means of a fan located at the station by the shaft on the 300 foot level; that some time during the late winter or spring of 1938 the use of the fan at the 300 foot level was discontinued and it was not thereafter used; that the clothing the men wore while working underground became covered with dust; that several raises connecting the various levels in the mine afforded *some* circulation of air brought about by changes in the atmospheric pressure; that the Mayflower Mine had a main shaft and an air-raise or man-way which was timbered and laddered but that some of the timbers of the man-way had decayed prior to 1937, and during that and subsequent years it was caved in and partially blocked, but still permitted the natural circulation of air; so that after the year 1938 the only air circulation in the mine was such as was pro-

vided by the main shaft and an air-raise very considerably blocked by cave-ins and decayed timber.

Here it is undisputed the Mayflower Mine was not provided with any mechanical ventilation whatever after May, 1938; that the company did not install exhaust pumps or filters of any type; that in the absence of mechanical ventilation it did not provide masks for its underground workers, notwithstanding the fact the airway was partially blocked and the natural circulation thereby impaired, and that at best "natural ventilation is never dependable and always should be supplemented by mechanical methods of ventilation." It seems that after 1938 the workers were abandoned to their fate—the contraction of the dread disease, silicosis—without an effort to even continue the operation of the only fan in the mine, notwithstanding the company, to quote the finding of the Board, "had personal knowledge of the silica laden dust conditions under which claimant was working in the Mayflower Mine during all of the time that claimant was there employed."

It is true, as found by the Board, that the company provided wet drilling equipment, but that, as the record indisputably shows, was, in and of itself, and as must be admitted, wholly insufficient to protect the workers from silicosis, in that those claimants who did not have silicosis when they began working in the mine contracted it while working there. Furthermore, wet drilling equipment could not and, as the facts in this case show, did not, protect claimants from the deleterious dust created by the blasting operations.

As hereinbefore pointed out (about which there is no conflict in the evidence) the company after 1938 did not provide any mechanical ventilation whatever against the silica laden dust repeatedly caused by its blasting operations. From the fact that claimant contracted silicosis while working in the mine, notwithstanding the use of wet drilling equipment, the conclusion is inescapable that by continuously breathing the silica laden dust produced by the blasting operations, claimant contracted silicosis. The disease could not have been contracted under the circumstances in any other manner.

In support of the contention that silicosis is an occupational disease respondents cite and rely upon *Habera v. Polaris Mining Company,* 62 Idaho 54, 108 P. 2d 297, and *Foote v. Helca Mining Company,* 62 Idaho 79, 108 P. 2d 1030. In the Habera case we construed the occupational disease law (SL 1939, ch. 161, p. 286), enacted and effective after claimant ceased working in the Mayflower Mine. Hence, the Habera case is not applicable here.

And even a casual examination of the Foote case will disclose we did not decide that silicosis is an occupational disease no matter what the facts and circumstances of the particlar case may be. In order that we could not be misunderstood, we pointed out that:

"Between the antipodes of silicosis as an occupational disease and its accidental contraction (*Brown v. St. Joseph Lead Co.,* 60 Idaho 49, 87 P. 2d 1000; *In re Nixon,* 60 Idaho 64, 87 P. 2d 1007) or climax (*Beaver v. Morrison-Knudsen Co.,* 55 Idaho 275, 41 P. 2d 605) is a zone wherein, depending on the particular circumstances of the case and accidental features, or the absence thereof, affliction from silicosis will or will not, under Sections 43-1001 and 43-1810, I. C. A., justify compensation."

In other words, what this court held, in effect, was, that whether the contraction of silicosis shall, or shall not, be deemed to be accidental depends "on the particular circumstances of the case and accidental features, or the absence thereof."

It will be noted we cited and approved *Brown v. St. Joseph Lead Company, supra.* While in the Brown case the lead company did not use wet drills and this company did, and while in the Brown case the failure of the lead company to use wet drills was a violation of the criminal statute (Sections 43-1810, 46-501, I. C. A.), this court emphatically held:

"The authorities all agree that silicosis is in large part preventable by one device or another; that is, by not permitting the silica dust to enter the lungs of the worker at all, or at least in such small quantities as not to be injurious." And we further held that: "As to there being an accidental injury within the meaning of the statute this court has repeatedly held, and the facts and circum-

stances of this particular case and the reasoning applicable thereto clearly shows the reasonableness and correctness of the holding, that the accident need not occur at one instant, but that there may be repetitious causes all relatively slight which culminate and result in as serious and fatal an injury as though the disabling or lethal blow or incident occurred at one time.

And further that: "This court has not placed a narrow or hypercritical construction upon sec. 43-1810, I. C. A., in determining what injuries are accidental or occupational diseases."

Continuing: "While compensation under our statute does not depend upon the negligence of the employer, negligence of the employer not only does not preclude compensation but compels it (71 C. J. 580). If the respondent does not admit that the infliction of silicosis upon its workmen was accidental and not expected it is forced into the position of intending they should become so inflicted and that it had utter disregard of the humanities, and was callously indifferent to their health, safety and life."

As in *Beaver v. Morrison-Knudsen Company, supra,* "we are not unmindful of the fact that the words 'injury' and 'accident' are not synonymous terms as used in the statute under consideration. The facts of this case require a recognition of the distinction in meaning of these two terms. In the circumstances confronting us here [and this applies to the circumstances confronting us in the case at bar] it is not thought essential to a decision of the case that the court assert or attempt to decide just when and where the injury and result both merged into a consummated 'accident.' "

Where, as here, there is no dispute as to the essential facts entitling claimant to recover compensation, "it becomes a question of law for the reviewing court to determine whether a proper application of the law has been made to the evidence." (*Horst v. Southern Oil Co.,* 49 Idaho 58, 61, 286 P. 369; *Rabideau v. Cramer,* 59 Idaho 154, 81 P. 2d 403).

Under our holding in *Brown v. St. Joseph Lead Company, In Re Nixon,* and *Beaver v. Morrison-Knudsen Company, supra,* claimant is clearly and unquestionably

entitled to recover compensation. Therefore, the orders, respectively, of the Board denying compensation are reversed and these causes, respectively, remanded, with directions to the Board to award compensation to appellants, respectively, in accordance with the grade of disability it found claimants, respectively, suffered. Costs awarded to appellants.

GIVENS, J., and WINSTEAD, D.J., concur.

MORGAN, J., deeming himself disqualified, did not sit at the hearing nor participate in the decision.

BUDGE, C.J., concurring specially in the conclusion reached:

The cause of action upon which appellants seek to recover accrued prior to the enactment of the Occupational Disease Compensation Law (Chapter 161, 1939 Session Laws).

There is only one question necessary to be determined in the above entitled action, namely, is the contracting of silicosis by appellants an occupational disease incident to or the result of the particular employment in which appellants were engaged, or is it a personal injury by accident arising out of and in the course of their employment. Each of appellants became afflicted with silicosis, or their affliction was accelerated, as a result of the conditions created by the employer during the period of their employment. The Industrial Accident Board concluded that it was an occupational disease and, therefore, denied appellants relief.

If appellants contracted the disease while engaged in occupational employment, it was not a personal injury by accident arising out of and in the course of their employment. Conversely, if the disease, silicosis, was not contracted while engaged in occupational employment, the injury sustained was the result of an accident arising out of and in the course of their employment and is compensable. The Board's findings of fact amply support the conclusion that it was an accident which resulted in the

injury, silicosis, and arose out of and in the course of appellants' employment.

Clearly, under the authorities hereafter cited, when applied to the facts of this case, a reversal of the Board's order denying compensation to appellant is imperative. Sec. 46-501-504, I. C. A.; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 274, 41 P. (2) 605; *McNeely v. Carolina Asbestos Co.*, (N. C.) 174 S. E. 509; *Seattle Can Co. v. Department of Labor & Industries*, 147 Wash. 303, 264 Pac. 739; *Bybee v. Ida. Eq.*, 57 Ida. 396, 65 P. (2) 730; *Ramsay v. Sullivan*, 51 Ida. 366, 6 P. (2) 856; *Reinoehl v. Hammacher Co.*, 51 Ida. 359, 6 P. (2) 860.

The same principle of law applies to the facts of this case as was announced in *Brown v. St. Joseph Lead Co.*, 60 Ida. 49, 87 P. (2) 1000, and in *In re Nixon*, 60 Ida. 64, 87 P. (2) 1007. The only difference in the facts being in the degree of negligence on the part of the employer in failing to protect its employees from contracting the disease, silicosis, and in furnishing a safe place in which to work and to supply them with known safety devices to protect them from constantly inhaling, while working, dust carrying silicosis particles.

Injury caused by conditions which science and industry have learned to control and eliminate cannot be classed as an occupational disease. *Brown v. St. Joseph Lead Co., supra; In re Nixon, supra.*

The judgment should be reversed.

AILSHIE, J., Dissenting—It is admitted in this case and so found, that "the accident" occurred prior to the enactment of "The Occupational Disease Compensation Law" (chap. 161, 1939 Sess. Laws).

In *Foote v. Hecla Mining Co.*, 62 Idaho 79, 108 P. (2d) 1030, this court said:

"Between the antipodes of silicosis as an occupational disease and its accidental contraction . . . . is a zone wherein, depending on the particular circumstanes of the case and accidental features, or the absence thereof, affliction from silicosis will or will not . . . . justify compensation." In the Foote case, authorities were cited illustrating the two extremes.

To my mind, the case at bar is not within the doubtful or uncertain zone. *It is just a plain silicosis case,* and would now be clearly dealt with under the Occupational Disease Compensation Law. There is no evidence of "accident" in this case. It does not fall within the rule adopted in *Beaver v. Morrison-Knudson Co.,* 55 Idaho 275, or the cases within that class. *Brown v. St. Joseph Lead Co.,* 60 Idaho 49, 63, on rehearing; *Hanson v. Ind. Sch. Dist.* 11-J, 57 Ida. 297, 303; *In re Soran,* 57 Idaho 483, 495; see, also, *Hoffman v. Consumers Water Co.,* 61 Idaho 226, 230, 231; *Hillman v. Utah P. & L. Co.,* 56 Idaho 67, 79.

It should be remembered that the decision in this case can not properly or legally turn on the question of *negligence* of the employer. This is not a common law action and the question of negligence is wholly immaterial. (Sec. 43-902, (I. C. A.) The Board heard the evidence and concluded that claimant, on whom the burden of proof rested, (*Fackenthall v. Eggers P. & S. Co.,* 62 Idaho 46, 108 P. (2d) 300) had not proven the occurrence of an "acdicent" within the purview of the compensation law.

As I read and understand the majority opinion, it is really predicated on the negligence of the employer, in not providing proper and adequate means of protection for the workmen and properly and adequately guarding against the inhalation of silica-laden dust.

For the latter reason, I am unable to concur in the conclusion reached.