(No. 7051. January 28, 1943.)

CATHERINE A. CAIN, Surviving widow on her own behalf, and on behalf of all other dependents of Donald E. Cain, deceased, Respondent, v. C. C. ANDERSON COMPANY, a corporation, employer, and IDAHO COMPENSATION COMPANY, Surety, Appellants.

[133 Pac. (2d) 723.]

Spencer Nelson and Ralph S. Nelson for appellants.

E. B. Smith and Robert I. Troxell for respondent.

BUDGE, J.—This is an Industrial Accident case on appeal from an award made by the Board in favor of respondent, surviving widow of Donald E. Cain, on her own behalf and on behalf of dependent children of Donald E. Cain, deceased. The pertinent facts, as found by the Board, and disclosed by the record, are substantially as follows:

On the 10th day of January, 1942, one K. F. Stringfield was secretary of appellant C. C. Anderson Company of Caldwell and Nampa; on and for more than one year prior to the 10th day of January, 1942, Donald E. Cain was employed by appellant C. C. Anderson Company of Caldwell, as manager of its electrical appliance department; on said 10th day of January, the manager of appliance department of C. C. Anderson Company of Nampa, with a co-employee, was delivering a piano to a residence in Caldwell; for the purpose of obtaining additional help he requested Donald E. Cain to come to said residence and bring one man with him; pursuant to said request, Donald E. Cain, in a Ford pickup, with a co-employee, drove out to said residence in Caldwell where the piano was to be delivered.

On arriving at the designated place, Cain and the other three men proceeded to remove the piano, which weighed 735 pounds, from a Chevrolet pickup truck, in which it had been placed at Nampa, into the residence at Caldwell. The Chevrolet truck had been previously backed up to the curb in front of the residence; the piano was then pushed to the end of the truck floor and from there lifted onto the ground; it was then pushed up along the walk leading to the front doorsteps of the residence. Donald E. Cain was on the front end of the piano and the other three men being at the other corners of said piano; the piano was then lifted up the steps, one at a time. When the piano was lifted over the threshold through the door the rug on the floor started to roll up, whereupon Mr. Johnson who was on the opposite side or corner of the piano from Cain, let go his hold on the piano, bent down, and replaced the rug. Donald E. Cain, at that particular time, lifted through the door the entire front end of the piano. The piano was then placed on a rubber-wheeled dolly and from there wheeled and pushed to the desired position in the house, where it was lifted off the dolly onto the floor, at which time the said Cain remarked, "They are ornery brutes to move, aren't they?" The board found the piano was moved into the residence about 11:00 o'clock a. m. After the piano was unloaded and placed in the residence, Cain, and the other man who accompanied him from the Caldwell store, walked out to the sidewalk and there assisted the driver of the Chevrolet pickup to get the pickup out of snow and ice and onto the road-way by pushing and shoving on the rear end of said pickup; after so doing, Cain and his co-employee returned to the Caldwell store. It appears from the record that Cain was usually talkative and cheerful. After assisting in the moving of the piano it was noticed he was neither talkative nor cheerful while going back to the store, and made comment about the weight of the piano. He appeared tired and had dark circles under his eyes.

Witness Evans was asked and made answer to the following question:

"Q. What remark was that, if you remember?

"A. Something like this—he said 'That was a heavy piano, wasn't it,' or something like that."

Witness Morton testified as follows:

"Q. Did Mr. Cain indicate to you he had suffered any injury in moving the piano?

"A. Mr. Cain, in talking about it—we were talking about the size of the piano. He did evidence some distress in lifting. He said it was tremendously heavy, he was lifting under the keyboard and he said he hoped he would never have to lift it again.

"Q. Did he indicate that he had suffered any injury himself?

"A. You mean a definite statement that he had hurt himself?

"Q. No. I mean by his expression—did his body show any physical defects—was he pale?

"A. Really my association with Mr. Cain was so limited, I don't believe that I would be able to answer that. He did show some distress in moving it by his facial expressions."

About 12:30 o'clock p. m. Cain met his wife and she noticed a change in his physical appearance and demeanor, and testified as follows:

"Don [her husband] came up the aisle of the store with the groceries and I noticed he was about the same color as the grocery sack, that was an ordinary grocery sack."

\* \* \*

"His complexion looked very sallow \* \* \* he didn't have his usual cheerful countenance \* \* \*. He was unusually sallow on that occasion."

Donald E. Cain, with his wife and his co-employee, drove to the Cain home; co-employee went to his home nearby. Cain, upon arriving home, immediately lay down on the davenport. Mrs. Cain further testified:

"The baby, who is twenty months old, went and tried to get his daddy up to play. I overheard Mr. Cain say 'Daddy can't even rest around here any more'."

And in answer to a question as to whether or not she had ever heard Cain remark about moving pianos, Mrs. Cain testified:

"Yes, I have heard him make the remark he hated to lift pianos because they were so awkward and heavy and he hoped he never had to handle another one—and he was glad he didn't handle pianos in his department."

His wife prepared the noon meal; Donald E. Cain got up and went to the table, but ate very little; thereafter he put on his hat and as he was going out the back door, his wife asked him to carry out some garbage, which he took, walked down the back-steps, over to the garbage can where he stooped over a little to empty the waste paper and as he raised up, his eyes appeared to "go glary" and he fell over backwards. His co-employee Stringfield, who had driven up to Cain's house for the purpose of taking him back to the store, attempted to revive deceased, but failing to do so, a physician was immediately summoned who examined deceased and pronounced him dead at about 1:25 o'clock p. m.

On the 12th day of January, 1942, an autopsy was performed on the body of the deceased which disclosed no infarct [dead tissue] or other damage to the heart muscles, but found an advanced arteriosclerotic thickening was seated in the aorta with a great many atheromatous plaques; that a small thrombus was found in the left coronary artery interposed between two degenerative plaques, and the cause of the death was diagnosed as coronary occlusion.

The Board found, among other things:

"That the lifting and moving of the piano on the 10th day of January, 1942, as above described, increased the blood pressure of the said Donald E. Cain, and *was a factor in precipitating the coronary occlusion which caused his death*, and that the said accident arose out of and in the course of his employment with the defendant, C. C. Anderson Company of Caldwell."

The board further found that the deceased left surviving him a dependent wife, Catherine A. Cain, one dependent child, Robert Allen Cain, born May 10, 1940, and a posthumus child, which, as stipulated by counsel, was born on May 28, 1942, "named Donna Catherine Cain."

Following the findings of fact made by the board, it also made certain rulings of law in which it fixed the compensation to be awarded to the dependent wife and minor children, and made and entered its order awarding said amounts.

Appellants specify six assignments of error. We will discuss the errors in their inverse order.

Assignment of error No. 6 is as follows:

The board erred in failing to find deceased died as a

result of disease and not as the result of an accident. Or, in other words, the board erred in finding the deceased sustained personal injury caused by accident, and arising out of and in the course of his employment. If appellants' contention is sustained that deceased died from a disease and not as the result of an injury caused by accident arising out of and in the course of his employment, other assignments of error become unimportant. On the threshold we are, therefore, confronted with the question of whether or not there is sufficient substantial and competent evidence to support the board's finding No. 8, to-wit:

"That the lifting and moving of the piano on the 10th day of January, 1942, * * * increased the blood pressure of the said Donald E. Cain and was a factor in precipitating the coronary occlusion which caused his death, and that the said accident arose out of and in the course of his employment with defendant, C. C. Anderson Company of Caldwell."

The board's findings may not be as direct, definite and certain as might be desired. However, we feel justified in concluding the board found the lifting in moving the piano was a factor which precipitated the coronary occlusion which caused the death of deceased. As was said in *Knock et. al. v. Industrial Accident Commission of California, et. al.*, 253 P. 712-14 (Cal. 1927):

"The term 'precipitation' employed by the commission in its foregoing findings is a term of well-known signification, meaning the act of precipitating or 'to hasten the occurrence of' an event; 'the causing to happen or come to a crisis suddenly, unexpectedly or too soon.' Webster's New International Dictionary, subject, 'Precipitation.' In other words, to precipitate is to accelerate a casualty. The foregoing finding of the commission to the effect that the death of the decedent was precipitated by this situation in a higher altitude than that to which he had long been accustomed must therefore be read in the light of the foregoing definition, and also in the light of the undisputed evidence in the case, and when so read the case, in our opinion, is brought directly within the principle declared by this court in the case of *G. L. Eastman Co. v. Industrial Acc. Comm.*, 186 Cal. 587, 200 P. 17, 20, wherein this court said:

" 'If the disability, although arising from a chronic heart trouble, was brought on by any strain or excitement incident

to the employment, the industrial liability still exists. Acceleration or aggravation of a pre-existing disease is an injury in the occupation causing such acceleration. [Citing cases.] * * *' * * *."

█ It was not deceased's regular employment to move pianos; however, he did so only on rare occasions. If the moving of the piano precipitated, accelerated or aggravated his heart trouble, which caused or hastened his death, recovery could be had. The fact that the deceased was suffering or afflicted with a serious heart ailment, predisposing him to coronary occlusion, was of no consequence in the case, and the fact that he might or would have died in a week or year with coronary occlusion was immaterial. (*Howard v. Texas Owyhee Mining and Development Co.*, (Ida.) 115 P. (2d) 749; In re Larson, 48 Ida. 136, 279 P. 1087; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 P. (2d) 605; In re Soran, 57 Ida. 483, 67 P. (2d) 906; *Evans v. Cavanagh*, 58 Ida. 324, 73 P. (2d) 83; *Taylor v. Federal M. & S. Co.*, 59 Ida. 183, 81 P. (2d) 728; *Nistad v. Winton Lumber Co.*, 59 Ida. 533, 85 P. (2d) 236; *Hanson v. Ind. School District*, 57 Ida. 297, 65 P. (2d) 733; *Young v. Harrington*, 61 Ida. 183, 99 P. (2d) 441; *Nistad v. Winton Lumber Co.*, 61 Ida. 1, 99 P. (2d) 52; *Hamlin v. University of Idaho*, 61 Ida. 570, 104 P. (2d) 625; *Patrick v. Ham Co. et al*, 119 Me. 510, 111 Atl. 912, 13 A. L. R. 427; *St. Clair v. Meyer Music House*, 211 Mich. 285, 178 N. W. 705.)

█ Death of a workman from coronary thrombosis or occlusion caused by over-exertion when resulting from an accident is compensable. (*Aranguena v. Triumph Min. Co.*, (Ida.) 126 P. (2d) 17; In re Soran, supra; In re Larson, supra; *Evans v. Cavanagh*, supra, *McCormick Lbr. Co. v. Dept. of Labor & Industries* (Wash.) 108 P. (2d) 807; *Northwest Metal Prod. Inc. v. Dept. Labor & Industries* (Wash.) 120 P. (2d) 855; *Barnes v. Dept. Labor & Industries* (Wash.) 106 P. (2d) 1069.)

█ The rule is too well established in this jurisdiction to require the citation of authorities to support the proposition that findings of fact by Industrial Accident Board, when supported by any competent evidence, are conclusive on appeal to this court.

We will now examine the testimony of experts testifying in the case for the purpose of determining whether or not there is any substantial evidence to uphold the board's

findings. Drs. Simpson and Handford performed the autopsy. Dr. Simpson, among other things, testified as follows:

"Q. Now, Doctor, will you state your opinion in regard to the cause of the death?

"A. It is my opinion that the lifting was probably the precipitating factor of this coronary thrombosis.
  * * * .

"Q. The fact that you found no infarcted areas in this heart would indicate what to you, with reference to the formation of a thrombus?

"A. It would indicate that the thrombus occurred within a very short time prior to death.
  * * *

"Q. Caused by what in your opinion?

"A. Caused by the blood being impeded in its circulation through the coronary arteries to such a degree that it is allowed to clot in a narrow portion of the lumen.
  * * *

"Q. Why was not the cranial cavity opened?

"A. The cause of death was found to our satisfaction in the heart, and there had been no symptoms that would suggest any intercranial disease.
  * * *

"Q. Do you have any reason to suspect that Mr. Cain suffered from diabetes?

"A. No.

"Q. Or from syphilis?

"A. No. His heart did not show the other changes that are usually present in an intrasyphilic heart.

"Q. And you found nothing which would lead to the belief he had either disease?

"A. No."

Dr. Handford, in the course of his testimony, testified as follows:

"Q. Could he have died of cerebral embolism?

"A. I don't believe so, respiration would have gone on—he wouldn't have died that quick.

"Q. Now, Doctor, taking into consideration the facts as read to you in the hypothetical question, have you an opinion, taking into consideration all of those facts and the

facts as disclosed by the autopsy made, as to whether or not the lifting and exertion by Mr. Cain on this piano had anything to do with the formation of the thrombus?

"A. Yes, I believe it did. I believe it was a factor.

"Q. Will you relate what your opinion is in that regard?

"A. With the condition that the heart was in, there are several factors which could produce this thrombus—straining, sudden changes of temperature, the addition of food to the stomach. Any of these factors could enter in, and he apparently had all of them. As I see the picture, he exerted himself, not to a point where he complained of pain, but at least he didn't talk in his usual manner. Just because he didn't complain is no sign he might not have had some distress in his chest—and then he went from the house out into the cold and that is a contributing thing, the contraction of the blood vessels—adding those things altogether and I think it is a chain of events that *began on lifting*, and it probably wouldn't have happened on a normal heart, but he didn't have a normal heart.

"Q. Have you any opinion whether or not had Mr. Cain not attempted any heavy straining and lifting, whether his health [life] would have been lengthened to some extent, Doctor—that is, would he have passed out as quickly as he did?

"A. Probably not. I can't say absolutely, no.

"Q. Have you an opinion as to whether or not the heart was aggravated by the lifting and straining, taking into consideration the previous damaged condition as disclosed by the autopsy?

"A. * * *. We know that lifting and straining raises the blood pressure and those do precipitate these accidents to the heart.

"Q. That is the precipitating factor, the cause of his death, in your opinion?

"A. That seems to be the factor, the thing you can put your finger on in this case that could start it.

* * *

"Q. * * * From your autopsy findings, what was the immediate cause of his death?

"A. Well, there was a coronary occlusion—a coronary thrombus—I did not see the thrombus—he found that.

* * *

"Q. Would you say a man with arteriosclerotic thickening and a great many atheromatous plaques, that Donald Cain had a very serious heart condition?

"A. I would say it was a serious thing.

* * *

"Q. And after he did die, isn't it hard to definitely say what was the cause of his death, whether it was going out into the open air after having had lunch?

"A. You mean what factors will produce his death?

"Q. Yes.

"A. I don't feel any one factor would—it is a termination of several. I don't see how you could pick out one stage and say which one caused it.

"Q. Would you put less emphasis on lifting the piano if you understood that there was four men that moved the piano and that they moved it before eleven o'clock in the morning and that he made no signs to any of the men that helped that he suffered any pains or had any undue stress or strain on him at the time?

"A. I think the strain had something to do with it— the only factor which doesn't—if he had complained of pain in the chest he would have been a typical picture of coronary thrombosis, but from what I know of Donald Cain, or heard of him, rather, he wasn't a complainer.

"Q. Could he have died of cerebral embolism?

"A. I don't believe so, respiration would have gone on— he wouldn't have died that quick.

* * *

"Q. You stated that a man afflicted such as Cain was would be apt to die at any time, but would the fact that he had been subjected to severe strain and lifting in your opinion, have anything to do with accelerating his death?

"A. Yes. A man with a heart like that, any lifting, any strain, emotional upset, excitement, anything like that which would tend to raise the blood pressure would be likely to produce his death.

* * *

"Q. Do you have an opinion as to whether or not the fact that his demeanor was changed and he became, passed from a cheerful man, a talkative man into one who was very quiet, his pallor became noticeable, would that indicate

anything to you as to the progress and symptoms immediately afterwards?

"A. That is the reason I believe the lifting had some part in it. Those are the first symptoms that are brought up—that was the start of his condition. After he lifted the piano—people noticed a change in his appearance and how he felt.

"Q. Would you have an opinion on this feature, that he very very seldom, if ever, laid on the couch before lunch, but on this occasion upon reaching home he immediately laid down on the couch, and that he ate a very very small amount of lunch, was very quiet during the time, would that indicate a progress of symptomology?

"A. That is the same—the progression of the changes of his usual character.

"Q. Having to do with this heart condition?

"A. Yes."

\* \* \*

Dr. Poindexter, a witness on behalf of the claimant, testified as follows:

"Q. Were you present in the court room when the hypothetical question was read to Dr. Simpson?

"A. Yes.

\* \* \*

"Q. Now, Doctor, you will take into consideration the facts which I have related to you in the hypothetical question I will ask you if you have an opinion as to whether or not the strain and lifting upon the piano by Mr. Cain on that day in question had anything to do with the formation of the thrombus which caused his death?

"A. I have.

"Q. Now will you relate that opinion?

"A. It is my opinion that the excessive strain which this man was under at the time he was moving this piano *precipitated the formation of a coronary thrombus.*

"Q. Now, have you an opinion as to whether or not the thrombus was of very recent origin in this case or whether it was of considerable age?

"A. Yes.

"Q. Now, what is that opinion?

"A. Judging from the report of the autopsy findings, my opinion would be that it was recent in origin.

"Q. Have you an opinion as to whether or not sufficient time had occurred from some little time after eleven o'clock a. m. on the morning of January 10, 1942, until one twenty-five o'clock p. m. on that same day to form this thrombus?

"A. Yes.

"Q. Was the time element sufficient in your opinion?

"A. Yes.

"Q. Have you an opinion as to the mechanics by which the lifting and the strain likely produced the coronary occlusion due to the thrombus?

"A. Yes,

"Q. Will you state the opinion, Doctor?

"A. The formation of a coronary occlusion under conditions of strain almost invariably occurs in the presence of previous changes as shown in this case. The formation is due to the degeneration of the vessel wall because of the decreased blood supply to the vessel wall from the closure of the vasa vasorum which supply the walls of the vessels. Ulcers of the walls occur with the laying down of calcium plaque. Under the presence of strain it is entirely possible, and it is my opinion that it has been proved by some men that due to the strain, muscular strain on the coronary arteries due to the spasm of the vessels associated with the increased strain upon the heart muscles, that the plaques can be loosened from their attachment to the wall of the coronary vessel, thereby producing beneath the hemorrhage, also that hemorrhage may occur from the walls of the coronary arteries themselves. Under the presence of strain, this bleeding can continue with a formation of a clot at the site of the occlusion, or where the ulceration originally was, or where the plaque was torn loose.

"Q. Have you an opinion as to the liklihood of such a thing occurring in Mr. Cain's case after the lifting and exertion?

"A. I have.

"Q. What is your opinion?

"A. It is my opinion that in all probability the coronary occlusion due to the pressure occurred in the coronary artery, at a site where some atheromatous plaques were located as a result of heavy strain.

\* \* \*

"Q. Taking into consideration the facts as shown in this case that there was no outward manifestation of symptomology by Mr. Cain such as an outcry or at least immediate pain or distress, but there was a change in his demeanor from a cheerful talkative man to immediately quiet, and a marked pallor in his face, a desire to, and he did lay down on a couch immediately when he got home at noon— what would that indicate in your mind?

"A. Do I have an opinion?

"Q. Do you have an opinion as to whether or not these so-called symptoms that I have indicated had anything to do with the beginning of the occlusion?

"A. Yes.

"Q. What is your opinion?

"A. It is my opinion that these symptoms were the prodromal for the complete formation of a coronary occlusion due to a thrombus and that they represented the beginning of the hemorrhaging at the site of the location of the formation of the occlusion due to the other factors such as coronary spasm.

"Q. That fact there was a time element of two hours, or possibly slightly over two hours from the time he lifted and strained upon this heavy piano until death occurred, have you an opinion as to whether or not this has any particular significance or not?

"A. Yes.

"Q. Will you relate your opinion?

"A. It would be that that would be the length of time required for the complete formation of an occlusion of the coronary arteries due to a thrombus.

"Q. You mean until the complete obstruction had taken place?

"A. The complete obstruction.

"Q. Have you an opinion as to whether or not there was any spasm of the coronary vessel in this particular case?

"A. Yes.

"Q. What is your opinion in that regard?

"A. We know from experimental work that after a coronary thrombus there usually, or almost invariably is also a reflex coronary spasm accompanying it, due to

shock—due to the terrific shock there from the muscula-ture of the heart."

\* \* \*

Dr. Swindell, called on behalf of appellant, testified as follows:

"Q. Have you read the autopsy report submitted in this case by Dr. Simpson?

"A. Yes, sir.

\* \* \*

"Q. What are the most probable causes of a heart condition of this type in a man aged thirty years?

"A. I think the most likely cause, according to our books, is diabetes and syphilis in persons of this age with that type of change present."

Whereupon the substance of the hypothetical question incorporating the pertinent facts as outlined in the state-ment of facts and disclosed by the record was stated to Dr. Swindell, and he was asked whether or not he had an opinion as to the cause of the death of deceased, Donald E. Cain, whether it was caused by disease, or caused by a disease aggravated by an accident, to which he answered in the affirmative.

"Q. What is that opinion?

\* \* \*

"A. It is my opinion the coronary occlusion was secon-dary to a pre-existing disease in the coronary artery or aorta.

"Q. Would the condition of the aorta such as Mr. Cain had, have been caused by lifting or a strain of any kind?

"A. I don't think so.

\* \* \*

"Q. Would you explain whether or not there would be an infarct in the coronary if that was from lifting?

"A. You would expect to find an infarct in the muscle or some great muscle change if the complete coronary occlusion had existed for two or three years, I think.

"Q. When do most deaths occur from coronary throm-bosis?

"A. Most of them, coronary thrombosis when the man is at rest.

"Q. What is the cause of those deaths?

"A. The pre-existing disease in the coronary artery is already present before you have a coronary occlusion, and we know that most coronary occlusions occur when a man is quiet rather than up on his feet. It is more apt to occur at night, according to statistics.

"Q. Would the fact that a man had just finished lunch and had been lying down have any possible bearing on the death by coronary thrombosis?

"A. It might. Coronary occlusion frequently occurs after a meal. People with coronary disease, we always warn them about over-loading the stomach because they do have occlusions after meals.

* * *

"Q. * * * Taking into consideration the facts and circumstances of this case as Mr. Nelson has related to you in the hypothetical question, the lifting and strain was one of the factors, was it not, that had something to do with the formation of this thrombus, or the occlusion of the coronary?

"A. It could have been.

"Q. Now, the stress and strain, taking into consideration the kind of a heart Mr. Cain had, will tend to produce a thrombus as one of the precipitating factors of the thrombus, will it not?

"A. Stress and strain could be a precipitating factor.

"Q. You don't deny the text in regard to that, do you, Doctor?

"A. No, but when you have an injury to the heart as the result of stress and strain, you have symptoms at the time, and those symptoms are usually very severe in the form of pain, or in the form of weakness, shock, a sweating and when you produce a sudden injury to the heart you can also find those symptoms present.

"Q. Isn't it conceivable and likely that in some instances, Doctor, that internal coronary hemorrhages might give rise to no symptoms for some little time afterwards?

"A. It is possible for it to, yes.

"Q. And these marked symptoms would not take place until marked contraction of the arteries had taken place?

"A. It is very unusual for them not to, but it is possible for them not to.

\* \* \*

"Q. You find nothing in the hypothetical question, nor in the report of the autopsy finding which would lead you to believe Mr. Cain was suffering from diabetes?

"A. No.

"Q. Now, do you find anything to lead you to believe he was suffering from syphilis, Doctor?

"A. The only thing that would make you suspect it is that it hasn't been proven that he didn't have syphilis. This sort of change in the aorta as described in the post-mortem report, in a man of his age would lead one to suspect it might be."

\* \* \*

Dr. Sprague, a witness on behalf of the defendant, testified as follows:

"Q. Have you seen the autopsy report?

"A. Yes."

The hypothetical question having been read to the other doctors, Dr. Spague being present at the time, was deemed to have been read to Dr. Sprague, who was asked and made answer to the following questions:

"Q. I will ask you, will you kindly state what, in your opinion, did cause his death?

"A. I think he had a cerebral accident. I don't think the coronary had anything to do with it at all.

\* \* \*

"Q. You were not present at the autopsy?

"A. No.

"Q. You did not see any of the tissue?

"A. No.

\* \* \*

"Q. Then this thrombus that was found in the coronary, the posterior branch of the left coronary wouldn't have anything to do with his death?

"A. Not a thing in the world. A one-sixteenth of an inch thrombus wouldn't have anything to do with his death.

"Q. That is your opinion?

"A. Yes.

\* \* \*

Dr. Stewart, a witness on behalf of appellants, testified:

"Q. Have you seen the autopsy report in this case, Doctor?

"A. Yes.

\* \* \*

"Q. Would a man aged thirty with a condition of the aorta such as described, would his life expectancy be shortened?.

"A. I should thing it would be shortened. His life expectancy—I don't know just how much but probably quite a bit.

\* \* \*

"Q. Assuming those facts as true, what, in your opinion caused the death of Donald Cain?

"A. I don't know. I just listened to Dr. Sprague's testimony here and probably that idea or guess is as good as any, it is a cerebral accident.

\* \* \*

"Q. Do you have any opinion whether or not his aiding three men in lifting a piano on the morning of January 11th had any effect on his death?

"A. I don't think it did. There is enough changes in the aorta and the various arteries here, enough degeneration so anything could happen in the vascular system with him. The changes possibly existed all through his system by reason of the fact he shows these advanced extensive changes in the aorta and some of the smaller vessels—that is what the autopsy shows.

\* \* \*

"Q. The heart was considerably damaged was it not, Doctor?

"A. The autopsy doesn't say it was. The autopsy said the heart was normal, and the testimony is that there were no scars and no infarcts. The heart was normal, microscopically normal. Normal myocardium, that means the heart muscles. In the coronary occlusion or coronary thrombosis or embolism, you are bound to have some changes even though it is only two or three hours old, you would have some change in the heart muscle. If it is an older one, you would have an infarct. In regard to symptoms,

with that much coronary involvement, this patient would have some symptom. He would have acute pain or some other pain.

\* \* \*

"Q. I think you stated on direct examination that the autopsy findings do not absolutely indicate death due to thrombus?

"A. Yes.

"Q. In other words, in your opinion it might be due to a thrombus or it might be due to a cerebral hemorrhage, or something else—is that the idea?

"A. Yes.

\* \* \*

"Q. Anything could happen, such as dropping dead at any time?

"A. Yes.

"Q. Or dropping dead after stress or strain?

"A. Yes, or any kind of condition.

\* \* \*."

Summarizing the testimony of Dr. Handford, who assisted in the autopsy:

"It is my opinion that the excessive strain which this man was under at the time he was moving the piano precipitated the formation of the coronary thrombus."

More weight must be given to the testimony of the expert who testified from first hand knowledge gained on autopsy examination than to the testimony of one whose knowledge is based only upon hypothetical facts. (*Aranguena v. Triumph Min. Co.,* (Ida.) 126 P. (2d) 17.) Dr. Simpson, who performed the autopsy, in answer to the following question, testified:

"Q. \* \* \* I will ask if you have an opinion as to whether or not the exertion which Mr. Cain underwent in moving this piano and lifting upon it, \* \* \* had anything to do with his death?

\* \* \*

"A. It is my opinion that the lifting was probably the precipitating factor of this coronary thrombosis."

Dr. Poindexter testified:

"It is my opinion that the excessive strain which this

man was under at the time he was moving this piano precipitated the formation of a coronary thrombus."

Dr. Swindell testified:

"Q. Now the stress and strain, taking into consideration the kind of a heart Mr. Cain had, will tend to produce a thrombus as one of the precipitating factors of the thrombus, will it not?

"A. Stress and strain could be a precipitating factor."

Section 43-1001, I. C. A., defining accident states:

" 'Accident' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law, * * *."

An order will not be reversed on appeal in compensation cases where there is a conflict in the evidence but where there is sufficient competent evidence order will be sustained; claimant has burden of establishing probable cause of disability, injury or death, and where there is any competent and substantial evidence to support the board's findings, the findings will not be disturbed. Members of the board are triers of facts, final judges of weight and credence to be given opinion of experts hypothetically stated. (*Fackenthall v. Egger's Pole & Supply Co.*, (Ida.) 188 P. (2d) 300; *Watkins v. Cavanagh*, 61 Ida. 720, 107 P. (2d) 155; *Bower v. Smith*, (Ida.) 118 P. (2d) 737; *Kaonis v. Ohio Match Co.*, (Ida.) 127 P. (2d) 776; *Wade v. Pacific Coast El. Co.*, (Ida.) 129 P. (2d) 894; *Stroscheim v. Shay*, (Ida.) 120 P. (2d) 267.)

We are satisfied there is competent and substantial evidence to support the board's findings and award based thereon.

Coming now to assignment of error No. 4, namely, the board erred in failing to find holding of autopsy, of which appellants were not notified, was prejudicial. There is no merit in this contention since we know of no statutory requirement making it incumbent upon respondent, or her representative, to give notice of holding of autopsy. (*Golden v. Wilson & Co.*, (Kan.) 281 P. 860.)

Neither is there any merit in appellants' contention that timely notice was not given, as required by Sec. 43-1202, I. C. A. Stringfield, secretary-treasurer of

C. C. Anderson Company of Caldwell, was present when Cain died. He signed employers' notice of death of deceased employee. (Sec. 43-1205, I. C. A.; *Long v. Brown*, (Ida.) 128 P. (2d) 754.) Notice to employer is notice to surety. (43-1806, I. C. A.; 43-1205, I. C. A.; *Long v. Brown*, supra; *Frost v. Idaho Gold Dredging Co.*, 54 Ida. 312-316, 31 P. (2d) 270; *Ford Motor Co. v. Hunt*, (Okla.) 293 P. 1083, 78 A. L. R. 1227; *Page v. State Ins. Fund*, 53 Ida. 177, 22 P. (2d) 681; *Crowley v. Idaho Industrial Training School*, 53 Ida. 606, 26 P. (2d) 180.)

Award of Industrial Accident Board should be and the same is hereby affirmed.

Ailshie, J. concurs. Holden, C.J., and Givens, J., concur in the conclusion.

KOELSCH, D.J., concurring specially.

This is a proceeding under the Workmen's Compensation Law. Donald E. Cain, having died while in the employ of the defendant, C. C. Anderson Company, his widow, Catherine A. Cain, on behalf of herself and her two minor children, filed her application with the Industrial Accident Board, alleging that said Donald E. Cain had died from accident arising out of and in the course of his employment, and asking for compensation under the said law.

The hearing before the Industrial Accident Board upon this application disclosed that the said Donald E. Cain died approximately two hours after he had assisted in delivering a heavy piano to a patron of his employer, and the board found:

"That the lifting and moving of the piano on the 10th day of January, 1942, as above described, increased the blood pressure of the said Donald E. Cain and was a factor in precipitating the coronary occlusion which caused his death, and that the said accident arose out of and in the course of his employment with the defendant, C. C. Anderson Company of Caldwell."

It is this finding, together with two alleged errors of procedure, that are challenged by this appeal.

It is first contended that notice to the employer of the accident was not given as soon as practicable, as required by the statute (Sec. 43-1202, I. C. A.). This notice was served on February 20, 1942, or forty-one days after the death of Cain. Service of this formal notice was acknowledged by K. F. Stringfield, secretary-treasurer of the C. C.

Anderson Company, employer. Mr. Stringfield was a neighbor of the Cains, and was present at the time of Cain's death, and knew of the subsequent autopsy and of its result immediately after such autopsy was made. We think this was sufficient notice under the statute. (Sec. 43-1205, I. C. A.)

Further, in our opinion, the formal notice on February 20, 1942, was timely and sufficient. In *Frost v. Idaho Gold Dredging Co.*, 54 Ida. 312, 31 P. (2d) 270, we interpreted the words in the statute, "as soon as practicable," as meaning within a reasonable time, and in *Long v. Brown* (Ida.) 128 P. (2d) 754, we held that "prejudice" as used in the statute "means that the employer by failure to receive notice has been less able to resist the claim."

The facts shown in the record herein do not warrant the conclusion that the notice to the employer was not given within a reasonable time, or that the employer was less able to resist the claim because of delay in the giving of formal notice. (*Frost v. Idaho Gold Dredging Co.*, supra.)

It is next contended that the application made by the claimant to the Industrial Accident Board was indefinite in that it did not give the exact time of the accident, or the conditions surrounding the same, and that the Industrial Accident Board erred in not granting defendant's motion for an order requiring the claimant to make her application more specific. There is no merit in this contention. The report of the accident and the claim for compensation were made on blanks in use by the Industrial Accident Board, and detailed the time and place and character of work in the course and out of which the claimed accident resulted. These documents do not have to set forth the facts with the exactitude of a pleading in a civil action. (In re Bones, 48 Ida. 85 (94), 280 P. 223; *O'Neil v. Madison Lumber Co.*, 61 Ida. 546 (550), 105 P. (2d) 194.)

Is the evidence sufficient to warrant the board's finding that the decedent's death was caused by an accident?

An autopsy was performed upon the body of Cain on January 12th, and the medical experts who made the autopsy, together with a heart specialist, who appeared at the hearing before the board agree that the immediate cause of the death of Cain was a coronary thrombosis, and that the heavy lifting by Cain in the moving of the piano at

about 11:00 o'clock a. m. on that day was the precipitating factor that brought about the thrombosis. The autopsy disclosed that Cain was afflicted with a condition of the heart which the medical men agree was sure to shorten the life expectancy of a man of his age. They agree that the condition of his heart was such that he might have died at any time, whether there was or was not a precipitating cause. However, Dr. Simpson and Dr. Handford, who performed the autopsy, gave it as their opinion that Cain's exertion in assisting to move the heavy piano was the factor that brought about the thrombosis at the time it did come about. Dr. Handford, after stating that several factors could have produced the thrombosis found in this case, such as straining, sudden changes of temperature, the addition of food to the stomach, in response to the question whether he considered the lifting and straining by Cain incident to his assistance in handling the piano was a precipitating factor in bringing on the coronary thrombosis, said,

"That seems to be the factor, the thing that you can put your finger on in this case that could start it,"
and he gave as the reason for his conclusion the fact that whereas prior to his helping to lift the piano Cain was talkative, and cheerful, thereafter he was quiet, witnesses noticed a change in his countenance, his appearance and his demeanor:

"Those are the first symptoms that are brought up— that was the start of his condition."

And Dr. Simpson, in response to the question whether "a man with a heart in this condition was likely to live very long," answered,

"Depending on his activities."

And Dr. Poindexter, in response to the question as to the probable expectancy of a man of that age with a heart in the condition of Cain's said it could not be predicated, and that if such a man lived a quiet, sedentary life, he should get along for several years, but that

"Any lifting, any strain, emotional upset, excitement, anything that would tend to raise the blood pressure would be likely to produce his death."

Dr. Poindexter, the heart specialist, further testified that the change in the demeanor, the countenance and ap-

pearance of Cain, noticeable immediately after the handling of the piano,

"Were the prodromal symptoms of the complete formation of a coronary occlusion due to a thrombus and that they represented the beginning of the hemorrhaging at the site of the location of the formation of the occlusion due to the other factors such as coronary spasm."

He also stated that in his opinion the time that elapsed between Cain's assistance in lifting the piano and his death, approximately two hours,

"Would be the length of time required for the complete formation of the occlusion of the coronary arteries due to a thrombus."

On the other side, Dr. Sprague, called as a witness for the defendants, gave it as his opinion that Cain probably died from a cerebral hemorrhage. He based this conclusion upon the symptoms displayed by Cain between the time of his help in lifting the piano and his death, particularly the fact that there was rapid discoloration of Cain's neck and face, and the fact that he fell backwards, the usual manner of fall of victims of cerebral hemorrhage.

Dr. Stewart, another witness called by the defendants, frankly stated that

"He did not know what caused the death of Donald Cain, and that Dr. Sprague's guess is as good as any."

Dr. Swindell, also called as a witness for the defendants, gave it as his opinion that the coronary occlusion found in the artery of Donald Cain was

"Secondary to a pre-existing disease in the coronary artery or aorta,"
and that the condition was not caused by lifting or strain of any kind.

How widely these medical men differed in their conclusions is strikingly shown by the testimony of Dr. Sprague, who gave it as his opinion that Cain died from a cerebral hemorrhage, and the testimony of Dr. Simpson, who stated that in making the autopsy the cranial cavity was not opened because

"The cause of death was found to our satisfaction in the heart, and there had been no symptoms that would suggest any intercranial disease."

It must be borne in mind that in a civil action facts need not be established beyond a reasonable doubt, a rule

which applies to proceedings under the Workmen's Compensation law. (*Roe v. Boise Grocery Co.*, 53 Ida. 82, 21 P. (2d) 910; see also *Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 74 P. (2d) 171; *McNeil v. Panhandle Lbr. Co.*, 34 Ida. 773, 203 P. 1068; *Soran v. McKelvey*, 57 Ida. 483, 67 P. (2d) 906.)

In the case of *Roe v. Boise Grocery Co.* (supra), this court quoted from *Adams v. Bunker Hill, etc., Min. Co.*, 12 Ida. 637, 89 P. 624, the following:

"There are very few things in human affairs, and especially in litigation involving damages, that can be established to such an absolute certainty as to exclude the possibility or even some probability, that another cause or reason may have been the true cause or reason for the damage rather than the one alleged by the plaintiff. But such *possibility* or even *probability* is not to be allowed to defeat the right of recovery where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence to justify a reasonable juror in concluding that the thing charged was prime and moving cause."

*Kaonis v. Ohio Match Co.*, (Ida.) 127 P. (2d) 776, is cited by the defendants, and apparently great reliance is placed thereon. An examination of the opinion in that case, however, shows that the facts are widely different than the facts in the case at bar. True, Kaonis died of an acute heart attack, but the evidence relied upon as showing the cause of the heart attack was utterly insufficient. There was no occurrence or event that could be pointed to as probably having been the cause of the sudden heart attack. Kaonis had been disabled for work from August 4, 1941, to September 1, 1941. On the first day of September he returned to his work, which was the placing of logs of timber on a load with a peavey as such logs were swung to the deck where he was working, and while said logs were still suspended. Co-employees of Kaonis testified that Kaonis' part in loading the logs was the lightest part of that work, and that it was comparatively easy. There were no premonitary symptoms, no complaint of any kind on his part. He had been active all morning and had just completed stamping some logs with a hammer, when shortly thereafter he was found dead. It was contended that his lay-off from work for twenty-eight days had so softened him physically that when he returned to work the strain upon his heart caused his death. There was no autopsy, and

the contention that he died from accident was based solely upon the fact that he died suddenly. There was no substantial, competent testimony to support that conclusion, and the board so found.

Another case cited by defendants and emphasized in their argument is the recent case of *Wade v. Pacific Coast Elevator Co.*, (Ida.) 129 P. (2d) 894. Wade, the decedent in that case, had been working for the elevator company since August, 1938. On September 2, 3 and 4, 1941, he didn't feel well and asked for leave of absence. He told the manager of the company that he had a pain in the middle of his back. On September 5, 1941, he returned to his work, and to all appearances "was fine." In the afternoon he and a co-worker unloaded between 60 and 70 sacks of wheat, weighing 135 to 150 pounds each. Their job completed, they rested a while, and then Wade climbed a ladder into a grain bin and called for the grain to be elevated. Presumably he had been shoveling grain to make room, and when the pile of grain became so high that it ran over, the manager climbed the ladder and found Wade lying dead in the bin. Doctor Farrell testified that the chest and abdomen revealed no cause for his death. That though,

"I made a gross examination of the arteries, the heart, the lungs and kidneys, the stomach and other organs of the abdomen, I found no cause of death. I was still unable to determine why he died after I made the autopsy. * * * It would appear that he wasn't suffering at the moment from cardiac distress from climbing the ladder."

The testimony of Dr. Howard is practically to the same effect; in fact, none of the medical witnesses testified that the work Wade had been doing, or the fact that he had just climbed a ladder 45 feet high that day, had anything to do with bringing about his death. Dr. Roberts, asked if the work done by Wade, and his climbing the ladder, would aggravate the condition of the heart as disclosed by the autopsy, replied:

"It is a possibility, not a probability."

There was, of course, contrary evidence, but the board accepted the former and found that Wade did not die as the result of an accident. It must, we think, be conceded that the board had sufficient competent and substantial evidence to support its conclusion, and under the rule so many

times announced by this court, where the board, upon conflicting evidence makes its finding, such finding, if supported by substantial evidence, is binding upon this court.

"Since the amendment of Art. V, Sec. 9, of the constitution,"

says Justice Ailshie in his opinion in that case,

"we have uniformly and consistently held that this court, on appeal in industrial accident cases, is limited to review of questions of law only. *Knight v. Youngkin,* 61 Ida. 612, at page 621, 105 P. (2d) 456, and cases therein cited."

See also *Aranguena v. Triumph Min. Co.* (Ida.) 126 P. (2d) 17, wherein there is a large array of cases on this subject.

It is our conclusion that under the evidence shown in the record in the case at bar, and under the rule above stated, the findings of the Industrial Accident Board, and the award by it made, must be and hereby are affirmed.