183 P.2d 202

WELLS v. POTLATCH·FORESTS, Inc., et al.

No. 7306.

Supreme Court of Idaho.

July 3, 1947.

Elder & Elder, of Coeur d'Alene, for appellants.

Paul C. Keeton and Paul W. Hyatt, both of Lewiston, for respondent.

MILLER, Justice.

June 4, 1943, Harry A. Wells, claimant and respondent, was in the employ of the Potlatch Forests, Inc., as fireman of a logging railroad locomotive, oil burner type, and running from Headquarters to logging camps served therefrom, and was used for hauling logs from the forests to landings and mills owned by said company. The record shows that respondent lived at Pierce, Idaho, and had been employed by the Potlatch Forests, Inc., in that vicinity for a number of years. In July, 1941, respondent took the job of firing on the logging railroad, and that respondent had not missed a shift for more than a year prior to June 4, 1943. The other members engaged with respondent in the operation of the logging train consisted of Paul Bailey, engineer, Willis Nines, conductor, and Pete Carr, brakeman.

At that season of the year there is snow in the hills surrounding Headquarters, and the train crew must exercise care in watching for snow and rock slides on the railroad track. When the logging train left Headquarters on the early morning of June 4, 1943, respondent was engaged in his usual capacity as fireman. Willis Nines, the conductor, was riding in the cab of the engine. As the train left Headquarters, it commenced to climb a small hill. The method of cleaning out the flues was a "sanding out" process, and as they started to climb the hill, Mr. Nines shoveled sand into the fire box of the boiler for the purpose of cleaning out the flues. At that time respondent had his head out the cab window watching for slides, and was struck in the face and eyes by a charge of sand from the smokestack. He removed his head into the engine and said "Hell's fire, I got sand in my eyes." Mr. Nines took over the job of firing and Pete Carr rendered first aid, and as a part thereof, prepared a solution of boric acid and water to wash the sand and grit from respondent's eyes. The respondent experienced considerable pain and water ran from his eyes almost constantly. About noon, Charlie Horn, who was in charge of all trains and their crews at Headquarters, saw respondent and said, "I hear you got hurt, Harry. How are you getting along? Will you be able to make it all right and finish the shift?" The accident had been reported to the trainmaster by Mr. Nines. The next day respondent followed his usual duties, but

his eyes hurt and he didn't feel good, the left eye was inflamed and the vision cloudy. On Sunday, June 6, 1943, respondent went to Orofino and consulted Dr. W. F. Robertson. The doctor gave him 5% argyrol and boric acid packs to place on the eyes. Respondent returned to Headquarters and worked June 7, 8 and 9, but on the evening of the 9th he told Mr. Horn his eyes were giving him a lot of trouble. He was then issued a hospital ticket by Mr. Horn and went to a hospital at Orofino. The following Saturday he went again to the office of Dr. Robertson, at which time he was advised to see an eye specialist, Dr. L. K. Worden, at Lewiston. He was treated by Dr. Worden, who advised him to enter the hospital at Orofino for observation. Certain spinal punctures, specimen of blood and urinal tests were performed, and the respondent was advised that all tests were normal and the doctor suggested that he return to Pierce and rest at home, subject to further observation. He was discharged from the hospital at Orofino July 1, 1943. His vision at that time was very poor. The doctors at Orofino told him that they did not know what was wrong, but that he would be all right in a few days and to rest up and let them know.

After staying in Pierce for upwards of ten days, the respondent's condition did not improve, and he returned to Orofino and was advised by Dr. Pappenhagen that he should go to Spokane to see Dr. J. W. Lynch. Upon arriving at Dr. Lynch's office he was taken to the office of Dr.

Andrew de Roetth and he was placed in a hospital and another spinal puncture was performed. Dr. Lynch came to the hospital and told him that the results of these tests were negative and normal. Respondent was then advised by Dr. de Roetth and Dr. Lynch to return to the Orofino hospital, and he was in and out of said hospital until the latter part of September, 1943. His vision was progressively worse. In November he returned to Spokane and Dr. de Roetth performed an operation on his left eye for the purpose of relieving the pain. Allergy tests were performed, but there was no improvement in his vision. He then returned to Pierce on December 21, 1943, and stayed until just after New Year's, when he left for Longview, Washington, to go under the care of his mother, at which time he was blind. In February, respondent returned to Dr. de Roetth and was advised that he had a double detachment of the retina. He then returned to Longview and went under the care of Dr. Clinton T. Cooke and Dr. Canfield Beattie. These doctors operated on the right eye, but the vision did not improve.

The record shows that prior to June 4, 1943, the date of the alleged accident, respondent had never had any trouble with his eyes and that his vision was very good. Doctors Cooke and Beattie testified by depositions that in their opinion the accident of June 4, 1943, contributed to and lighted up a condition which caused the respondent's ultimate blindness. In the fall of 1945, respondent consulted Dr. J. W. Thompson of Moscow. Idaho. He found the right eye was cataractous and the left eye negative.

■ The Constitution, Sec. 9, Art. V, as well as statutory provisions, Sec. 43-1408, I.C.A., limits the jurisdiction of the Supreme Court on appeals from the Board to a review of questions of law only. In the case of McNeil v. Panhandle Lumber Company, 34 Idaho 773, 783, 203 P. 1068, 1071, this court held: "The well-settled rule that forbids this court to reverse a trial court in cases in which the evidence is conflicting, but sufficient to sustain a decision, applies to the findings of fact made by the Industrial Accident Board in cases of this kind, and is applicable likewise to the district court in reviewing the decisions of said Board; the jurisdiction of said courts in such cases being limited to a review of questions of law."

In the case of Fackenthall v. Eggers Pole & Supply Co., 62 Idaho 46, 51, 108 P. 2d 300, 302, it is said: "The evidence is of such a character and nature as might lead different minds to different conclusions as to the cause of the ailment about which they were testifying. This, however, is a good illustration of the wisdom of the rule, and perhaps a justification for it, that this court should not disturb the findings of the board when the witnesses have personally appeared and testified before them, whereas, the court has not had the opportunity of observing their appearance and de-

meanor and the manner of their testifying. See Phipps v. Boise Street Car Co., [61 Idaho 740], 107 P.2d 148."

In the case of Cain v. C. C. Anderson Co., 64 Idaho 389, 397, 133 P.2d 723, 726, a case in which the moving of a piano was claimed to have precipitated, accelerated or aggravated heart trouble, and caused or hastened his death, the court said:

"Death of a workman from coronary thrombosis or occlusion caused by over-exertion when resulting from an accident is compensable. (Citing a number of cases.)

"The rule is too well established in this jurisdiction to require the citation of authorities to support the proposition that findings of fact by Industrial Accident Board, when supported by any competent evidence, are conclusive on appeal to this court."

The Findings of Fact contain a very comprehensive recital of the facts contained in the record. Paragraph XVI of the Findings recites: "The Board finds as an ultimate fact that claimant's accident of June 4, 1943, while in the employ of the Potlatch Forests, Inc., resulted in an injury which contributed to his present total disability."

From said Findings, the Board (Par. III) concluded: "The claimant is entitled to an award against the defendants and each of them as compensation for total disability at the rate of $12 per week during the time he is totally disabled for work, not to ex-

ceed a period of 400 weeks from June 10, 1943, and thereafter a weekly compensation of $6 per week, if his total disability for work still exists."

April 4, 1946, the Board made and entered its award in the amount of $12 per week from June 10, 1943, for a period of 400 weeks, and thereafter at the rate of $6 per week during the continuance of respondent's total disability.

April 26, 1946, the appellants appealed from the findings of fact, rules of law and an award. In the first specification of error, it is urged that the employer did not have due and timely knowledge of the accident. Section 43-1205, I.C.A., among other things, provides that want of notice or delay shall not be a bar to proceedings under Workmen's Compensation Law if it is shown that the employer, his agent or representative, had knowledge of the accident. A representative of the employer was in the cab of the locomotive at the time the accident occurred. Another representative of the employer discussed the accident with respondent and some three or four days thereafter gave respondent a ticket to the hospital at Orofino, in order for respondent to obtain better and more professional treatment than was obtainable at Headquarters. We think there is no merit in the contention that the employer did not have timely knowledge of said accident or that the findings of the board are not based upon substantial competent evidence.

Specifications 2, 3 and 4 relate more or less to the same subject matter. That is, that the evidence shows that respondent's disability is the result of a disease and that there is no evidence that the alleged injury contributed to his disability; or that respondent was suffering from a pre-existing infirmity and for that reason appellants were only liable for the additional disability resulting from such accident; and, that the board erred in making its finding of fact in that there is no substantial evidence supporting such finding and that the respondent could probably regain the sight of his right eye if the cataract were removed.

The findings of fact contain a summary of the testimony of the doctors identified with and associated in the case or participating in the treatment of respondent on account of the injury of June 4, 1943. In other words, Finding No. IX shows respondent's eyesight previous to the accident was normal. Finding No. X discloses that on Sunday, June 6, 1943, respondent called on his family physician, being Dr. W. F. Robertson at his office in Orofino with an irritated eye, which looked to the physician as if there were several scratches on it. Th physician got some particles of dust and sand out of it and gave the respondent a solution of argyrol for use in his eyes and told him to use boric acid packs. On June 12th following, said physician saw respondent again and sent him to Dr. Donald K. Worden, an eye specialist in Lewiston.

Finding No. XI discloses that on June 12, 1943, Dr. Worden examined respondent who was complaining that both eyes were bothering him but particularly the left eye. During the medical examination the doctor found no evidence of trauma. The diagnosis the doctor gave as iritis of the left eye. At that time he was unable to make an examination of the interior of the eye but did so two days later when he advised respondent that his condition was not an ordinary iritis or inflammation but that he found some disturbance of the circulation. He sent the patient to the employer's hospital contractor, the Orofino Hospital, where respondent was treated by Dr. Pappenhagen but under Dr. Worden's direction. Dr. Worden's last examination of respondent was June 29th. From this examination he did not arrive at a cause for respondent's condition. He found distention of the blood vessels in both eyes, indicating an interference with the blood circulation, and advised the contract hospital physicians that he was not sure that this was primarily an eye condition.

The finding further shows that in view of respondent's subsequent medical history, with detachment of the retina of both eyes, Dr. Worden concurred in Dr. de Roetth's diagnosis of Harada's disease and was of the opinion that the disease was not caused by trauma and that the only connection between the accidental injury and respondent's eye condtion was "as a precipitating factor or hurrying factor," if he got sand in his left eye only, acceler-

ating the condition in the left eye, it would have nothing to do with the right eye.

Finding No. XII discloses that on June 19, 1943, respondent called at the Orofino Hospital, consulted with Dr. Pappenhagen and entered the hospital on June 22, at which time Dr. Pappenhagen obtained respondent's medical history and made some examination. The respondent was in the hospital about 15 days, under treatment of Dr. Pappenhagen, acting under the direction of Dr. Worden. During this period, treatment was symptomatic and diagnostic. All tests for systemic infection were normal and negative. Respondent's eye condition grew progressively worse. It is also shown in the history obtained by Dr. Pappenhagen that there was a suggestion that respondent might accidentally have gotten sand in his eye about the time his trouble commenced. In his opinion, as a general practitioner, there was no causal connection between respondent's accidental injury on June 4, 1943, and his eye condition on June 22 and subsequently.

Specification No. XIV shows that about July 18th respondent was referred to a Spokane doctor (Dr. J. W. Lynch) who immediately passed him on to Dr. Andrew M. de Roetth, an eye specialist. July 19, 1943, Dr. de Roetth first examined the respondent, who had at that time an iritis of his right eye, for which the doctor could find no acceptable cause. He was given no history of an injury by accident. He made all the routine examinations and administered local treatment. The respondent also had a detachment of the lower half of the retina of the left eye. Dr. de Roetth examined him on September 23rd and again on October 30th when he found the retina of the right eye as well as of the left detached. During Dr. de Roetth's ministrations respondent was at times hospitalized in Spokane, and at times in the Orofino Hospital. November 18th Dr. de-Roetth again examined him treating both eyes and performing a posterior sclerotomy in the left eye. He was discharged from the Spokane Hospital December 21, 1943, at which time he was practically blind.

Early in 1944 respondent moved to Longview, Washington. He returned to Spokane in February, when Dr. de Roetth made his last examination. Dr. de Roetth was definitely convinced from his examination that respondent's malady, which did not respond to any treatment, was Harada's disease. He described it as a mysterious disease, the origin of which was unknown. The doctor's opinion was that the blindness was not due to accident.

Specification No. XV discloses that about April 1, 1944, respondent placed himself under the care of Doctors Cooke and Beattie, eye physicians and surgeons of Portland, Oregon. He was under their treatment, at times in a Portland hospital until the latter part of October, 1945. He was

last examined by them February 13, 1946.

Respondent "came to the Portland doctors complaining of poor vision in both eyes. They obtained a history of the loss of vision over several months and that he had had an injury followed by an inflammatory attack. They found the left eye to be blind, the right partially so; with detachment of the retina in each eye, quiet iritis (uveitis) in the left eye and the same in the right eye, but not entirely quiescent."

During the period of their ministrations, the Portland doctors made repeated examinations. In June, 1945, they operated upon the right eye by diathermy punctures of the sclera in an unsuccessful attempt to restore its vision. Immediately thereafter a cataract developed. Their examination of February 13, 1946, showed that respondent was blind in both eyes.

In answer to an incomplete hypothetical question Dr. Cooke testified that assuming that before the accident the respondent's eyes were normal, he was of the opinion that, while a detachment would probably have developed in due time without a trauma, respondent's eye condition was connected with the accident and minor injury therefrom. He said, "I think the sand in his eye was a sufficient trauma, combined with the preexisting disease (Uveitis) which I assumed, to produce the detachment."

Dr. Beattie, in answer to a similar question testified: "That assuming that before the accident respondent's eyes were normal," it was his opinion that the accidental injury very probably precipitated the chain of circumstances which led to the loss of the sight of the eyes. Differing somewhat from his associate who assumed the pre-existence of the uveitis. Dr. Beattie testified that *"the uveitis very probably precipitated the detachment, but added that there was probably some preexisting lack of cohesion of the retina to the deeper structures to which it was attached."* (Emphasis added.)

Dr. Joseph Thompson, an ophthalmologist, of Moscow, Idaho, whose qualifications as an expert were admitted, from the history of the case given him by the respondent in 1945, and just before the hearing, gave it as his opinion that if respondent got sand in his eyes and there was an injury to the cornea, scratched it, "it is a toxic infection. Toxin comes from the bacteria in the wound of the eye and absolves into the eye and produces the ill being, iritis, retinitis and uveitis * * * and the detachment and ophthalmitis". He said the right eye was cataractous and the left eye negative. Asked about Harada's disease he stated, "I wouldn't know it if I saw it".

The board makes no finding that there was pre-existing infirmity or a diseased condition of the eyes. Dr. de Roetth was convinced that the condition of respondent's eyes, "which did not respond to any treatment was Harada's disease." He de-

scribed it as a "mysterious disease, the origin of which was unknown." He was of the opinion that the blindness was not due to the accident. Dr. Worden concurred in Dr. de Roetth's diagnosis that it was Harada's disease, and was of the opinion that the diseased condition was not caused by trauma, that "if he got sand in his left eye only that it might accelerate the condition of that eye, but have nothing to do with the right eye". Dr. Cooke and Dr. Beattie made repeated examinations and in June 1945, operated on the right eye in an unsuccessful attempt to restore the vision. Dr. Cooke said "I think the sand in his eye was a sufficient trauma * * * to produce the detachment", and Dr. Beattie said, it was his opinion that the accidental injury very probably precipitated the chain of circumstances which led to the loss of the sight of the eyes.

There is no finding that there was any infirmity or diseased condition of respondent's eyes prior to the accident. Of the various doctors treating respondent none thereof ever stated or even remotely suggested any infirmity or diseased condition until he became blind. The only assistance the board received from Dr. de Roetth to the effect that it was Harada's disease, is that it was a "mysterious disease, the origin of which was unknown", and "which did not respond to any treatment". It is evident the board got but little or no assistance from that source.

According to Harry Searls Gradle, A. B., M. D. Professor of Ophthalmology, Northwestern University; Chief of Ophthalmology, Michael Reese Hospital; Member of the Committee of American Registry Council; Associate Editor, American Journal of Ophthalmology, in a contribution to National Encyclopedia, Vol. 7, page 413, on diseases of the eye, among other things, says: "Ophthalmology, that branch of the medical sciences which deals with the anatomy, function, and diseases of the eyes. Probably the earliest recognition of this specialty is to be found in the Egyptian Papyrus Ebers of about 1650 B. C., a document of 110 pages of which 8 were devoted to the diseases of the eyes and their care. * * * Although there still remains much to be learned, ophthalmology is today the most advanced of medical sciences, due to the free visibility of the eye and to the fact that the efforts of a large number of investigators are concentrated upon a comparatively small area."

That same author says: "The adolescence of Ophthalmology started about the time of Galan, who died in 210 A. D. During that period a knowledge of the anatomy of the eye was developed, from which arose a better recognition of the actual disease conditions. In the latter part of the period, the laws of the physics of light and the application of such laws to the eyes were developed."

It would seem that a study of the diseased condition of the eyes from a period of

time antedating the birth of Moses would bring to attention every kind of disease common to the eye and particularly those diseases fatal to the vision.

The record shows the Dr. Worden gives it as his opinion that the disease was not caused by trauma (and "if he got sand in his left eye only", it would have "nothing to do with the right eye").

The aforementioned author in Volume 4, page 230, National Encyclopedia, in commenting on diseases of the eye, is more or less in opposition to the statement made by Dr. Worden, says: "Following an injury by which the eyeball has been opened, either by trauma or by operation, which has caused a persistent inflammation of that eye there may develop a serious inflammation of the other eye, known as sympathetic ophthlamia".

A Text-Book of Ophthalmology by Sir W. Stewart Duke-Elder, M. A., D. Sc. (St. And.), Ph.D. (Lond.), M. D., CH.B. F.R.C.S. Vol. III, page 2366, in commenting on Acute Diffuse Serous Choroiditis (Harada's Disease) has this to say: "This is a peculiar type of acute diffuse exudative choroiditis of unknown aetiology and of good prognosis, described as occurring in Japan by Harada (1926). It occurs in adults of 30 to 50 years of age and apparently of good health, and comes on suddenly with a serious and progressive diminution of vision. Initially it is characterized by a diffuse yellowish oedematous opacity over the whole of the fundus and a general vitreous haze *without clinical evidence of involvement of the anterior segment of the eye;* detachment of the retina then occurs, and extends so that the entire retina becomes detached in a funnel-shaped dome to the papilla, while there is a diffuse atrophy of the pigment layer. At this stage perception of light may be lost. After several weeks the detachment becomes flatter, and eventually complete re-attachment takes place so that the fundus assumes its normal colour apart from the presence of irregularly placed pigment spots, *the process being accompanied by a return of the vision to normal.* During the first two or three weeks there is headache, loss of appetite, nausea and vomiting, but after two or three weeks as the changes in the fundus reach their height, the general symptoms disappear.

The 1942 Year Book of the Eye, by Louis Bothman, M.D., Senior Attending Ophthalmologist, St. Luke's Hospital, Chicago; formerly Clincal Professor of Ophthalmology, University of Chicago, page 103, in commenting on Bilateral Uveitis with Associated Detachment of Retina, among other things, says:

"The clinical picture of Harada's disease consists of headaches, slight fever, bilateral anterior or posterior uveitis, retinal hemorrhages, hyperemic disks, congestion and dilation of the retinal veins, and vitreous opacities which often obscure the fundus picture. Scleritis may occur. Some authors believe that loss of hair, baldness, poliosis, vitiligo associated with retinal de-

430

tachment and impaired hearing are part of the same syndrome. The retinal detachment usually heals spontaneously.

"Harada's disease and bilateral uveitis associated with alopecia and poliosis, vitiligo and occasionally deafness are severe forms of nontraumatic uveitis, while sympathetic ophthalmia, which may be accompanied by poliosis, is the most severe form of perforating traumatic uveitis."

The characteristics of Harada's disease as disclosed by the text-book authorities do not agree with that given by Dr. de Roetth. No one would get the impression from the testimony of Dr. de Roetth that the disease consists of headaches, retinal hemorrhages, hyperemic disks, congestion and dilatation of the retinal veins, and vitreous opacities which often obscure the fundus picture, and that the entire retina becomes detached in a funnel-shape dome to the papilla, and that after a lapse of time of several weeks the detachment becomes flatter and eventually complete reattachment takes place so that the fundus assumes normal colour apart from the presence of irregularly placed pigment spots, the process being accompanied by a return of the vision to normal. According to Dr. de Roetth's testimony the disease is of such intensity and severity as to completely destroy the eyesight.

Attorneys for appellants have vigorously urged that the testimony of the doctors establish the fact that the blindness is due to a diseased condition, and would have occurred irrespective of the accident; that the board erred in not so finding. We have recited the contents of the findings quite at length so as to show the careful manner of the board in arriving at its conclusion. The testimony as to what caused the blindness is conflicting and there is ample room for reasonable minds to disagree.

 Since the record fails to disclose, and the board did not find, that respondent's blindness was superinduced other than through an accidental injury by getting sand in his eyes and that there is no evidence that the blindness was caused by and through Harada's disease there is no alternative other than to affirm the award of the Industrial Accident Board. Cost to respondent.

BUDGE, C. J., GIVENS and HOLDEN, JJ., and SUTTON, D. J., concur.